**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1605**

_____

MARIA YANEZ-MARQUEZ,

        Petitioner,

     v.

LORETTA E. LYNCH, Attorney General,

        Respondent.

_____

On Petition for Review of an Order of the Board of Immigration Appeals.

_____

Argued: September 17, 2014        Decided: June 16, 2015

_____

Before KING and FLOYD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

_____

Petition denied by published opinion. Senior Judge Hamilton wrote the opinion in which Judge King and Judge Floyd joined.

_____

**ARGUED:** Amanda Hunnewell Frost, AMERICAN UNIVERSITY, Washington, D.C., for Petitioner. Jonathan Aaron Robbins, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Margaret Hobbins, MAGGIO & KATTAR, Washington, D.C., for Petitioner. Stuart F. Delery, Assistant Attorney General, Civil Division, Daniel E. Goldman, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

HAMILTON, Senior Circuit Judge:

Maria Yanez-Marquez (Yanez), a native and citizen of El Salvador, petitions for review of a Board of Immigration Appeals (BIA) decision dismissing her appeal from the order of an Immigration Judge (IJ) ordering her removal from the United States to El Salvador. Prior to ordering Yanez's removal, the IJ denied her motion to suppress certain evidence and to terminate the removal proceeding. At the center of Yanez's petition for review is her challenge to the denial of this motion, which was premised on, inter alia, alleged egregious violations of her Fourth Amendment rights. For the reasons stated below, we deny the petition for review.

I

A

Because the IJ denied Yanez's motion to suppress and to terminate without an evidentiary hearing, we review the evidence in the light most favorable to Yanez. Cotzojay v. Holder, 725 F.3d 172, 178 (2d Cir. 2013).

In June 2008, agents from the Immigration and Customs Enforcement (ICE) were investigating Robert Bontempo, Jr. and Rebecca Bontempo, the owners of Annapolis Painting Services (APS). The agents suspected that the Bontempos employed and harbored illegal aliens. The Bontempos owned a property, 402

- 2 -

Harbor Drive, Annapolis, Maryland (the Premises), which ICE surveillance revealed was occupied by Jose Umana Ruiz (Umana), an illegal alien and El Salvadorian citizen. Unbeknownst to the agents, Yanez, an illegal alien and Umana's long-time partner, also lived at the Premises. In June 2008, Yanez was five months pregnant.

In an affidavit in support of a search warrant for the Premises and numerous other houses owned by the Bontempos that were tied to the housing of illegal aliens, ICE Special Agent Francis Coker (Agent Coker) outlined the extensive background evidence concerning how employers employ and house illegal aliens, and the extensive evidence concerning how APS and the Bontempos engaged in such practices.[1] The affidavit also included a picture of the Premises and described it as a "single-family home[,] a single story building with a shingled roof." (J.A. 524).[2] A mailbox, with the number "402," is

---

[1] The search warrant itself incorporated by reference Agent Coker's affidavit, thus avoiding any difficulty with the Supreme Court's decision in Groh v. Ramirez, 540 U.S. 551 (2004). See United States v. Hurwitz, 459 F.3d 463, 470-71 (4th Cir. 2006) ("As a general rule, a supporting affidavit or document may be read together with (and considered part of) a warrant that otherwise lacks sufficient particularity 'if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant.'" (quoting Groh, 540 U.S. at 557-58)).

[2] The picture of the Premises included in Agent Coker's affidavit shows a single story home with a gable roof. It shows (Continued)

- 3 -

located in front of the Premises. (J.A. 524). The affidavit noted that Anne Arundel County land records reflected a sale of the Premises from Jennifer Scott to the Bontempos in October 2000 for the sum of $156,000.00.

The search warrant that accompanied Agent Coker's affidavit had two boxes on its front side, where the issuing judge was required to designate the time of day when the search was authorized to occur. The "daytime" box read "in the daytime-- 6:00 A.M. to 10:00 P.M." (J.A. 455). Meanwhile, the alternative "any time" box read "at any time in the day or night as I find reasonable cause has been established." (J.A. 455). In issuing the warrant for the Premises, a United States Magistrate Judge in the District of Maryland checked only the daytime box and struck the language next to the any time box that would have authorized a nighttime search as follows: "~~at any time in the day or night as I find reasonable cause has been established~~." (J.A. 455) (strikeout in original). Thus, the warrant for the Premises authorized a daytime search only, to be conducted between 6:00 a.m. and 10:00 p.m. The warrant also specified that the search was to be completed on or before July 4, 2008. The scope of the items to be seized under the warrant

---

two windows in the roof facing the street and one window on the right gable end.

was broad and included illegal aliens, travel documents, financial records, and photographs of harbored aliens.

The magistrate judge issued the search warrant on June 24, 2008. The search of the Premises took place six days later, on the morning of Monday, June 30, 2008. Prior to the search, several ICE agents, along with officers of the Anne Arundel County Police Department, assembled in an Annapolis parking lot for a briefing. ICE Agent Sean Currie (Agent Currie), the ICE search team leader, assigned responsibilities for the search. After the briefing, the search team proceeded to the Premises, which was ten to fifteen minutes away by car, to execute the warrant.

According to Yanez, the search warrant was executed at the Premises at 5:00 a.m.[3] Agent Currie knocked on the front door which was answered by another occupant of the Premises, Jose Mendoza-Gomez (Mendoza), who immediately was handcuffed and seated on the couch in the living room for officer safety. After detaining Mendoza, two agents proceeded upstairs. Umana and Yanez were awakened by the yelling of "police" and a loud banging on their bedroom door. (J.A. 141). Umana and Yanez had

---

[3] Agent Currie and ICE agent Richard Federico, Sr. (Agent Federico) executed declarations that were presented to the IJ. In their respective declarations, they assert that the search began at 6:02 a.m. The return on the search warrant states that the search was completed at 8:56 a.m., but it fails to indicate when the search began.

been planning to sleep later than normal that morning because Yanez had the day off from work. She felt groggy and confused because "it seemed like it was the middle of the night." (J.A. 141). She had no idea what was going on. Umana clothed himself, but before he could reach the locked door, the ICE agents broke it down, causing the door to hit Umana's hand. Two agents "burst" into the room and screamed "police." (J.A. 142). One agent grabbed Umana's neck and threw him to the ground. The other held a gun to Umana's head while pinning his body and face to the floor. The agents screamed "don't move." (J.A. 142). Once Umana was held down, an agent pointed a gun at Yanez's head and yelled "don't move." (J.A. 142). Yanez, who was wearing a "nightshirt," cried and pleaded for permission to cover herself "with more clothes." (J.A. 142). The agent again screamed "don't move" and pointed his gun at her head. (J.A. 142). Umana told the agents that Yanez was pregnant and begged them to allow her to get dressed. A female agent was called for assistance and came to Yanez, telling her that "it will be okay." (J.A. 142). Yanez was scared that she or Umana would be harmed, and she was not allowed to use the restroom. Although an agent was speaking in Spanish, loud noise obstructed Yanez from hearing. The agents handcuffed Umana and escorted him downstairs. Yanez grabbed a "T-shirt to put over [her] nightshirt" as she was led downstairs at gunpoint. (J.A. 143).

Downstairs, Yanez saw four ICE agents in the living room. She was told to join Umana on the couch. Although the occupants denied that anyone else was in the house, the agents knocked down doors and found no one. For five to ten minutes, the agents questioned the occupants about their identities, asking repeatedly about Annapolis Painting Services. The occupants denied knowing anything about the company. The agents were "extremely hostile," and Yanez thought that someone would be harmed if they did not answer the questions. (J.A. 143). The agents then took the occupants' fingerprints and escorted Umana and Mendoza away. Yanez was "never shown a warrant, [never] told that [she] had a right to an attorney, [and never told] that [she] could refuse to answer any questions." (J.A. 143).

The ICE agents searched the entire house, "ripp[ing] apart each room that they went through," kicking down doors, scattering documents, and turning over furniture. (J.A. 144). During the search, Yanez again was questioned. The agents asked her if she had a car and keys for it, which Yanez conceded. Yanez felt she had no choice but to surrender the keys. Her car was searched. The agents told Yanez that she "had" to sign "several pieces of paper," although she did not want to sign them, asked why she had to sign, and did not understand what they said. (J.A. 144). Despite no one reading or explaining the documents to her, she signed them.

Before leaving, an ICE agent told Yanez that she would get a letter from "the Immigration Court" and warned her not to move to a different location. (J.A. 145). When the agents left at 9:15 a.m., they took many of Yanez's belongings, including her pay stubs, tax returns, and photo albums. These items were never returned.

After the search, Yanez left the Premises and spent the night at her sister-in-law's house. She returned to the Premises the following day to find the landlord's employees "hauling" off her and Umana's "belongings . . . to the trash dump." (J.A. 145). Later that day, Yanez experienced stress and severe abdominal pain that she believes were caused by the search, seizure, and questioning. At 5:30 p.m., she was taken to the hospital where she was treated and released after a few hours. Upon her release from the hospital, Yanez was told her unborn child would be "alright." (J.A. 145).

Yanez's statements to the ICE agents were memorialized on two "Form I-213s" (Record of Deportable/Inadmissible Alien).[4]

---

[4] "A Form I-213 is an official record routinely prepared by an [immigration officer] as a summary of information obtained at the time of the initial processing of an individual suspected of being an alien unlawfully present in the United States." Bauge v. INS, 7 F.3d 1540, 1543 n.2 (10th Cir. 1993). "Form I-213[s] . . . are records made by public officials in the ordinary course of their duties, and accordingly evidence strong indicia of reliability." Felzcerek v. INS, 75 F.3d 112, 116 (2d Cir. 1996).

The forms state that Yanez is a native and citizen of El Salvador and that she "last entered the United States on or about April 2007 without inspection." (J.A. 453). The forms further reveal that Yanez has been illegally present in the United States since her April 2007 entry.

B

On July 10, 2008, the Department of Homeland Security (DHS) issued a notice to appear to Yanez. The notice alleged that Yanez was "an alien present in the United States who had not been admitted or paroled." (J.A. 547); see also 8 U.S.C. § 1182(a)(6)(A)(i) (rendering inadmissible an alien who has not been properly admitted or paroled). In support of this allegation, the notice alleged that Yanez: (1) was not a United States citizen; (2) was a native and citizen of El Salvador; (3) entered the United States at an unknown location on an unknown date; and (4) was not "admitted or paroled after inspection by an Immigration Officer." (J.A. 547).

On February 10, 2010, the DHS filed its "Submission of Intended Evidence," which designated the evidence the DHS intended to introduce in the removal proceeding as follows: (1) the two Form I-213s; (2) the search warrant executed for the Premises; and (3) the affidavit in support of the warrant. In response, on April 21, 2010, Yanez filed a "motion to suppress and to terminate removal proceedings." (J.A. 106). Yanez

claimed that, during the June 30, 2008 search, seizure, and questioning, the ICE agents egregiously violated her Fourth Amendment rights, violated her Fifth Amendment due process rights, and failed to follow five applicable federal regulations. In her motion, Yanez stressed that the Supreme Court's decision in INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), permitted the application of the exclusionary rule in a civil removal proceeding where the Fourth Amendment violations were either widespread or egregious.

More specifically, Yanez first claimed that the ICE agents egregiously violated her Fourth Amendment rights when they executed the search warrant at 5:00 a.m. instead of between 6:00 a.m. and 10:00 p.m. Second, Yanez claimed that the warrant's lack of particularity egregiously violated her Fourth Amendment rights in that (1) she was not specified as an "item" to be seized in the warrant and (2) the agents should have known the Premises was a "two-floor, multi-family dwelling." (J.A. 118). Third, Yanez claimed that her Fourth Amendment rights were egregiously violated when the agents used excessive force during the search and seizure. Fourth, she claimed that the Fourth Amendment violations committed by the agents were part of a widespread pattern of ICE misconduct. Fifth, Yanez claimed that the agents violated her Fifth Amendment Due Process Clause rights when they coerced her into making incriminating

- 10 -

statements. Finally, she claimed that the agents violated five different federal regulations, in particular, 8 C.F.R. § 287.8(b)(2) (permitting an immigration officer to detain a person for questioning if he has reasonable suspicion "that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States"), 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States."), 8 C.F.R. § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained."), 8 C.F.R. § 287.8(a)(1)(iii) ("A designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect, prisoner or assailant."), and 8 C.F.R. § 287.3(c) (which requires that an alien who is arrested without a warrant and placed in formal removal proceedings be informed that she has a right to an attorney and provided with a list of attorneys that provide free legal services).

In its response, the DHS first argued that the exclusionary rule does not apply to civil removal proceedings, also relying on the Supreme Court's decision in Lopez-Mendoza. The DHS stressed that the Court in Lopez-Mendoza "did not affirmatively state that egregious Fourth Amendment violations are an exception to the Court's holding that the Fourth Amendment's exclusionary rule is inapplicable in civil deportation proceedings." (J.A. 47). Alternatively, the DHS argued that, even if the exclusionary rule applied, Yanez failed to set forth facts establishing a prima facie case of an egregious violation of her Fourth Amendment rights or a violation of her Fifth Amendment Due Process Clause rights. See Matter of Barcenas, 19 I. & N. Dec. 609, 611 (BIA 1988) (noting that petitioner challenging the admissibility of evidence in removal proceeding is required to establish a prima facie case for exclusion). Finally, the DHS argued that the ICE agents did not violate any applicable regulations, and, even if they did, it did not justify suppressing the challenged evidence. Along with its motion, the DHS submitted the declarations of Agent Currie and Agent Federico. These declarations take issue with not only Yanez's timing assertions, but also her assertions concerning the manner in which the search, seizure, and questioning were carried out.

In her decision denying the motion to suppress and to

terminate, the IJ first rejected the DHS's contention that the exclusionary rule did not apply in civil removal proceedings, relying on Lopez-Mendoza and BIA precedent. The IJ then set forth the prima facie case framework, noting that Yanez bore the initial burden of alleging facts constituting an egregious Fourth Amendment violation. The IJ then turned to Yanez's substantive claims and rejected each one of them.

In rejecting Yanez's claim that the ICE agents committed egregious Fourth Amendment violations, the IJ stated:

> With respect to the timing of entry, even if ICE agents entered "at 5 a.m." as the Respondent asserts, the Court cannot find that such a violation of the terms of the warrant — by a single hour — would be egregious. That simply does not amount to conduct that "shocks the conscience." With respect to the entry into the bedroom, even if an officer . . . had simply come upon the locked door, banged on it, announced his presence, and forced it open with another officer, the Court cannot conclude that such action would be egregious. The agents were executing a search warrant. . . . The alleged timing of entry into the residence and method of entry into the bedroom were not egregious violations.

(J.A. 543). Turning next to Yanez's challenge to the amount of force used by the agents, the IJ rejected this challenge, noting:

> With respect to the force used by the officers in the home, the Court cannot conclude that excessive force was used, even considering solely the Respondent's account. The Respondent's affidavit claims that an officer held a gun to her head. The Respondent acknowledges that both officers were screaming, "don't move!" in English and Spanish. . . . The Respondent indicates that her partner told the officers that the

- 13 -

Respondent was pregnant and asked that she be allowed to put on more clothes. She also indicates that when the officers heard this, they asked for a female officer to come up to the bedroom. These actions, while no doubt extremely frightening for the Respondent, are consistent with ensuring officer safety and enabling the officers to control a potentially dangerous situation. There is no showing that greater than necessary force was used or that weapons were drawn any longer than necessary. The Respondent acknowledges that the officers identified themselves as police and repeatedly shouted at them not to move. She acknowledges that a female officer was called as soon as her partner told them that she was pregnant. She also acknowledges that she was not put in handcuffs, that she was not taken out of the house for further processing, and that she was not placed in immigration detention. The actions of the agents and the other officers were reasonable under the circumstances and reflect that ICE officials took appropriate account of the Respondent's pregnancy throughout the operation. As such, those actions cannot be found to be egregious.

(J.A. 544).

With regard to Yanez's claim that the ICE agents violated her Fifth Amendment Due Process Clause rights, the IJ rejected this claim, concluding that the circumstances as a whole did not "reflect an atmosphere of coercion and intimidation that would render [Yanez's] statements involuntary." (J.A. 544).

Next, the IJ rejected two of the five regulatory claims pressed by Yanez. First, the IJ rejected Yanez's § 287.8(a)(1)(iii) claim on the basis that she had "not made a sufficient showing that excessive force was used." (J.A. 545). Second, the IJ rejected the § 287.3(c) claim because the DHS's notice to appear had sufficiently advised Yanez of her right to

- 14 -

counsel. As for the three remaining regulatory claims, for some inexplicable reason, the IJ quoted the regulations (§ 287.8(b)(2), § 287.8(c)(2)(i), § 287.8(c)(2)(ii)), but did not explain her reasoning for rejecting the claims.

The IJ then addressed Yanez's widespread ICE misconduct argument. The IJ rejected this argument, finding "no basis to suppress evidence in this case on the basis of what may or may not have occurred in other cases or during other enforcement operations." (J.A. 546).

The IJ concluded her opinion by noting that Yanez had "not met her burden of establishing a prima facie case for suppression of evidence obtained in violation of the Fourth Amendment, the Fifth Amendment, ICE regulations, or on any other theory." (J.A. 546). Accordingly, the IJ denied the motion to suppress and to terminate.

On December 13, 2010, the IJ found that the DHS had satisfied its burden of proving removability by clear and convincing evidence. See Karimi v. Holder, 715 F.3d 561, 566 (4th Cir. 2013) ("In removal proceedings, the government bears the burden of proving removability . . . by clear and convincing evidence."). Because Yanez had not sought relief from removal, the IJ ordered that Yanez be removed from the United States to El Salvador.

On January 11, 2011, Yanez filed a notice of appeal with

- 15 -

the BIA. In her brief filed with the BIA on April 1, 2011, Yanez reiterated all of the arguments that she raised before the IJ, save one. She did not claim, as she did before the IJ, that the Fourth Amendment violations committed by the ICE agents were part of a larger, widespread pattern of misconduct by ICE officials. To be sure, Part III D of Yanez's motion to suppress and to terminate filed with the IJ raises the widespread pattern claim in a section following Part III C iv of the motion, which raised the § 287.3 claim. In her brief filed with the BIA, the conclusion section of the brief follows the § 287.3 claim, and the brief contains no argument concerning widespread constitutional violations committed by ICE officials.

On April 7, 2011, the DHS filed its brief with the BIA. In urging the BIA to affirm the IJ's decision, the DHS "incorporate[d] by reference the entirety" of the brief it filed with the IJ. (J.A. 8).

On April 15, 2013, the BIA dismissed Yanez's appeal. In its decision, the BIA first noted that the exclusionary rule does not apply in civil removal proceedings unless the alleged Fourth Amendment violation is egregious. Next, the BIA rejected Yanez's claim that the ICE agents egregiously violated her Fourth Amendment rights, relying on the reasoning of the IJ. The BIA also adopted the reasoning of the IJ in rejecting Yanez's Fifth Amendment Due Process Clause claim and her

regulatory claims under § 287.8(a)(1)(iii) and § 287.3(c). With regard to the three regulations the IJ quoted but did not address, § 287.8(b)(2), § 287.8(c)(2)(i), and § 287.8(c)(2)(ii), the BIA determined that no remand was necessary because the IJ adequately addressed the nature of Yanez's "detention and interrogation, as well as the warrant used by the ICE officers." (J.A. 5). As a result, the BIA affirmed the IJ's decision and dismissed Yanez's appeal.

Yanez filed a timely petition for review under 8 U.S.C. § 1252.

## II

### A

When the BIA affirms and adopts an IJ's decision and includes its own reasons for affirming, we review both decisions as the final agency action. Ai Hua Chen v. Holder, 742 F.3d 171, 177 (4th Cir. 2014). Legal conclusions made by the IJ and the BIA are reviewed de novo. Crespin-Valladares v. Holder, 632 F.3d 117, 124 (4th Cir. 2011). We must uphold the BIA's decision unless it is "manifestly contrary to the law and an abuse of discretion." Tassi v. Holder, 660 F.3d 710, 719 (4th Cir. 2011). The BIA abuses its discretion if it fails "to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." Id.

A petitioner challenging the admissibility of evidence in a civil removal proceeding "must come forward with proof establishing a prima facie case before the [government] will be called on to assume the burden of justifying the manner in which it obtained the evidence." Matter of Barcenas, 19 I. & N. Dec. at 611 (citation and internal quotation marks omitted). Under this burden-shifting framework, "if the petitioner offers an affidavit that could support a basis for excluding the evidence . . . , it must then be supported by testimony." Maldonado v. Holder, 763 F.3d 155, 160 (2d Cir. 2014) (citation and internal quotation marks omitted). Upon the establishment of a prima facie case by the petitioner, the burden of proof shifts to the government to demonstrate why the IJ should admit the challenged evidence. Id.

In the case before us, both the IJ and the BIA applied this framework and concluded that Yanez did not establish a prima facie case on any of her claims to warrant a suppression hearing. It is this conclusion that Yanez principally challenges in this court.

B

In her petition for review, Yanez presses claims under the Fourth and Fifth Amendments, as well as certain regulatory claims. The heart of her case is that the Fourth Amendment's exclusionary rule requires the suppression of all statements and

documentation regarding her national origin and citizenship obtained by the ICE agents, including the two Form I-213s. Yanez contends that, without the two Form I-213s and her statements, the government cannot meet its burden of proving her alienage and removability, and, therefore, her removal proceeding should be terminated. At a minimum, Yanez claims that her affidavit and other record evidence provide a basis in which to exclude the challenged evidence, such that an evidentiary hearing is required. To resolve Yanez's contentions, we must first decide whether the Fourth Amendment's exclusionary rule applies in the civil removal proceeding before us.

C

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although the Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands," Arizona v. Evans, 514 U.S. 1, 10 (1995), to deter violations of the Fourth Amendment, the Supreme Court established the exclusionary rule, Weeks v. United States, 232 U.S. 383, 398 (1914), which, "when applicable, forbids the use of improperly obtained evidence at [a criminal] trial." Herring v. United States, 555 U.S. 135, 139 (2009); see also Lopez–

- 19 -

Mendoza, 468 U.S. at 1040–41 ("The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated."). "[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation--whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." United States v. Crews, 445 U.S. 463, 470 (1980) (footnotes omitted).

Given the "substantial social costs" of the application of the exclusionary rule, United States v. Leon, 468 U.S. 897, 907 (1984), namely, "the loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication that therefore occurs," Lopez–Mendoza, 468 U.S. at 1041, "the exclusionary rule is not a remedy we apply lightly," Sanchez-Llamas v. Oregon, 548 U.S. 331, 347 (2006). Indeed, the Supreme Court has cautioned that the exclusionary rule's "massive remedy," Hudson v. Michigan, 547 U.S. 586, 595 (2006)--the suppression of evidence--is "our last resort, not our first impulse," id. at 591.

While the applicability of the exclusionary rule in a criminal proceeding is settled, the applicability of the rule in

a civil removal proceeding is not. The Supreme Court has never applied the rule in a removal proceeding. In fact, in Lopez-Mendoza, the Supreme Court held that the exclusionary rule generally does not apply in removal proceedings. 468 U.S. at 1034; see also United States v. Oscar-Torres, 507 F.3d 224, 230 (4th Cir. 2007) ("Lopez-Mendoza establishes that the exclusionary rule does not apply in civil deportation proceedings.").

In Lopez-Mendoza, Adan Lopez-Mendoza (Lopez) and Elias Sandoval-Sanchez (Sandoval), two citizens of Mexico, were summoned to separate removal proceedings, and both were ordered deported after such proceedings. 468 U.S. at 1034. Immigration and Naturalization Service (INS) agents arrested Lopez at his place of employment, a transmission repair shop, without a warrant to search the repair shop or a warrant to arrest anyone there. Id. at 1035. The repair shop owner refused to permit the agents to speak with his employees during work hours. Id. However, while one agent engaged the repair shop owner in conversation, another agent entered the repair shop and spoke with Lopez. Id. While he was being questioned, Lopez told the agent his name and that he was from Mexico with no close family ties in the United States. Id. After the agent placed Lopez under arrest, he was transported to an INS office where he admitted that he was born in Mexico, was still a citizen of

- 21 -

Mexico, and had entered the United States without inspection by immigration officials. Id.

At his removal hearing, Lopez moved to terminate the removal proceeding on the basis that he was arrested illegally. Id. The IJ held that the legality of Lopez's arrest was not germane to the removal proceeding, and, therefore, declined to rule on the legality of the arrest. Id. On the basis of the Form I-213 and an affidavit executed by Lopez, the IJ ordered that Lopez be removed from the United States to Mexico. Id. at 1035-36.

On appeal to the BIA, the BIA dismissed Lopez's appeal. Id. at 1036. The BIA noted that the "mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding." Id. (citation and internal quotation marks omitted). On Lopez's petition for review, the Ninth Circuit vacated Lopez's removal order and remanded the case to the BIA for a determination of whether Lopez's Fourth Amendment rights were violated when he was arrested. Id.

The second petitioner in Lopez-Mendoza, Sandoval, was arrested at his place of employment, a potato processing plant in Pasco, Washington. Id. INS agents went to the plant, with the permission of its personnel manager, to check for illegal aliens. Id. During a shift change, plant workers were asked innocuous questions in English by INS agents as they entered the

plant to work.  Id. at 1037.  Upon seeing the INS agents as he approached the entrance to the plant, Sandoval "averted his head, turned around, and walked away."  Id.  Sandoval was among the thirty-seven people detained and transported to a county jail.  Id.  At the jail, Sandoval was questioned by an INS agent and admitted, in a written statement, that he unlawfully entered into the United States.  Id.

At his removal hearing, Sandoval contended that the evidence offered by the INS should be suppressed as the fruit of an unlawful arrest.  Id.  The IJ considered and rejected Sandoval's claim that he had been illegally arrested, but ruled in the alternative that the legality of the arrest was not relevant to the removal hearing.  Id.  Based on the written record of Sandoval's admissions, the IJ found him removable.  Id. at 1038.

On appeal to the BIA, the BIA dismissed Sandoval's appeal.  Id.  The BIA declined to invoke the exclusionary rule, concluding that the circumstances of the arrest had not affected the voluntariness of Sandoval's written statement.  Id.  On Sandoval's petition for review, the Ninth Circuit reversed the removal order.  Id.  The Ninth Circuit opined that Sandoval's detention by the INS agents violated the Fourth Amendment, that the statements he made were a product of that detention, and that the exclusionary rule barred their use in a removal

hearing.  Id.

In resolving the cases before it, the Supreme Court quickly disposed of Lopez's challenge to his removal order because the "mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding."  Id. at 1040 (citation and internal quotation marks omitted).  According to the Court, "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Id. at 1039.

Sandoval's case meaningfully differed from that of Lopez's case in that Sandoval challenged the admissibility of evidence at his removal hearing, while Lopez only raised a personal jurisdiction challenge.  Cf. Oscar-Torres, 507 F.3d at 229 (noting that, in Lopez-Mendoza, Lopez's case only raised a personal jurisdictional challenge, that is, Lopez sought "suppression of [his] body," while Sandoval conceded personal jurisdiction, but sought to suppress the evidence in his removal proceeding).  Indeed, the Court in Lopez-Mendoza observed that Sandoval had "a more substantial claim" because "[h]e objected not to his compelled presence at a deportation proceeding, but to evidence offered at that proceeding." 468 U.S. at 1040.  As a result, the Court considered whether the exclusionary rule should apply to prohibit the government from using illegally

obtained evidence of Sandoval's alienage against him in his removal proceeding.  Id. at 1040–41.

In determining whether to apply the exclusionary rule in a removal proceeding, the Supreme Court in Lopez-Mendoza noted that removal proceedings are "purely civil," id. at 1038, the purpose of which is "not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws."  Id. at 1039.  The Court emphasized that the evidentiary protections that apply in criminal proceedings do not apply in removal proceedings because: (1) criminal trials adjudicate the defendant's guilt, whereas removal proceedings determine the alien's "eligibility to remain in this country"; and (2) unlike criminal trials, removal hearings do not impose punishment on the alien.  Id. at 1038.  Given this, the Court characterized the intent of a removal hearing as a "streamlined determination of eligibility to remain in this country, nothing more."  Id. at 1039.

Viewing a removal proceeding through the proper lens, the Court employed a cost-benefit analysis to determine whether to apply the exclusionary rule to removal proceedings, id. at 1041-50, weighing the "social benefits of excluding unlawfully seized evidence against the likely costs."  Id. at 1041; cf. Leon, 468 U.S. at 906-08 (concluding that evidence obtained pursuant to the good faith reliance on a defective warrant should not be

excluded because the cost of exclusion outweighed the benefit of deterrence); United States v. Janis, 428 U.S. 433, 454 (1976) (declining to apply the exclusionary rule to a civil tax proceeding because the cost of exclusion outweighed the benefit of deterrence). On the benefit side of the ledger, the Court proffered four reasons why, in the context of removal proceedings, the deterrent value of the exclusionary rule was significantly reduced. 468 U.S. at 1043-46. First, the Court opined that, because deportability can be proven by evidence independent of the arrest, the legality of the arrest was irrelevant. Id. at 1043-44. Second, the Court noted that very few undocumented aliens actually challenge removal orders based on Fourth Amendment grounds, making it "unlikely" that an immigration agent would "shape his conduct in anticipation of the exclusion of evidence" at a removal hearing. Id. at 1044. Third, because the INS already had its own comprehensive scheme for deterring Fourth Amendment violations, application of the exclusionary rule was unnecessary. Id. at 1044-45. Finally, the Court reasoned that the availability of alternative remedies, such as civil or criminal sanctions against the immigration official, further undermined the deterrent value of the exclusionary rule. Id. at 1045.

The Lopez-Mendoza Court then turned to the cost of exclusion. First, the Court observed that the effect of

applying the exclusionary rule required courts "to close their eyes to ongoing violations of the law." Id. at 1046. Second, applying the exclusionary rule would significantly complicate the "simple" and "streamlined" deportation system. Id. at 1048. Finally, the Court opined that, with respect to the apprehension of over one million undocumented aliens each year, expecting immigration agents to provide written details of each arrest and to attend suppression hearings would severely burden the administration of immigration laws. Id. at 1048-49.

Weighing the benefits of exclusion against the likely costs, the Court in Lopez-Mendoza was persuaded that the scales tipped against applying the exclusionary rule in removal proceedings. Id. at 1050. In particular, the Court emphasized that the "costs" of applying the exclusionary rule in removal proceedings are "high," noting that such application "would compel the courts to release from custody persons who would then immediately resume their commission of a crime through their continuing, unlawful presence in this country." Id.

After concluding that the exclusionary rule was inapplicable to removal proceedings because the costs outweighed the benefits, a plurality of the Court in Lopez-Mendoza appeared to limit the scope of its holding by apparently reserving judgment for cases that presented a "good reason to believe that Fourth Amendment violations by INS officers were

widespread." Id. at 1050.[5] In carving out this apparent limitation, the plurality emphasized that its holding "[did] not deal . . . with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." Id. at 1050-51 (footnote omitted).

Four Justices dissented in Lopez-Mendoza. Each of these four Justices opined that the exclusionary rule should apply in removal proceedings. See id. at 1052 (White, J., dissenting) ("I believe that the conclusion of the majority is based upon an incorrect assessment of the costs and benefits of applying the rule in [removal proceedings]."); id. at 1051 (Brennan, J., dissenting) ("I fully agree with Justice White that . . . the exclusionary rule must apply in civil deportation proceedings" not because it is a deterrent but because "of the Fourth Amendment itself."); id. at 1060 (Marshall, J., dissenting) ("I agree with Justice White that . . . [Supreme Court precedent] compels the conclusion that the exclusionary rule should apply in civil deportation proceedings."); id. at 1061 (Stevens, J., dissenting) ("Because the Court has not yet held that the rule

---

[5] While Chief Justice Burger joined the parts of the opinion (Parts I to IV) holding that the exclusionary rule did not apply in removal proceedings, he did not join in the part of the opinion (Part V) recognizing that egregious or widespread Fourth Amendment violations might warrant application of the exclusionary rule.

of . . . [Leon] . . . has any application to warrantless searches, I do not join the portion of Justice WHITE's opinion that relies on that case.  I do, however, agree with the remainder of his dissenting opinion."). Considering the position of the four dissenting justices, a total of eight justices in Lopez-Mendoza seem to have agreed that the exclusionary rule should apply in removal proceedings in some form.

Since Lopez-Mendoza was decided, circuit courts have applied the exclusionary rule in removal proceedings in a variety of circumstances.  See, e.g., Cotzojay, 725 F.3d at 179-83 (addressing whether warrantless entry into alien's home was egregious Fourth Amendment violation); Oliva-Ramos v. Att'y Gen., 694 F.3d 259, 278-79 (3d Cir. 2012) (addressing whether ICE agents' entry into apartment and seizure of the alien egregiously violated the Fourth Amendment, and whether the ICE agents' conduct was part of a widespread pattern of Fourth Amendment misconduct); Puc-Ruiz v. Holder, 629 F.3d 771, 779 (8th Cir. 2010) (addressing whether the arrest of the alien egregiously violated the Fourth Amendment); Kandamar v. Gonzales, 464 F.3d 65, 71 (1st Cir. 2006) (addressing whether alien's statements were obtained in egregious violation of the Fourth Amendment and the Due Process Clause of the Fifth Amendment); Almeida-Amaral v. Gonzales, 461 F.3d 231, 233-37 (2d

Cir. 2006) (addressing whether the alien's seizure was an egregious Fourth Amendment violation); Gonzalez-Rivera v. INS, 22 F.3d 1441, 1449 (9th Cir. 1994) (addressing whether stop of alien egregiously violated the Fourth Amendment). Such courts have applied the rule even though the Court's limiting language in Lopez-Mendoza could be labeled as "dicta" in that the Court arguably reserved judgment on whether the exclusionary rule applies in the event of an egregious Fourth Amendment. See, e.g., Oliva-Ramos, 694 F.3d at 275 (noting that the apparent limitation in Lopez-Mendoza could be characterized as dicta).

In our case, the IJ, the BIA, and the Attorney General all agree that the exclusionary rule applies in removal proceedings to egregious violations of the Fourth Amendment.[6] Although we have not had occasion to consider the application of the exclusionary rule in removal proceedings in a published opinion,[7]

_____

[6] Before the IJ and the BIA in this case, the DHS took the position that the exclusionary rule does not apply in removal proceedings under any circumstances. However, the Attorney General, who represents the government in this court, takes a position contrary to that of the DHS, and his position concerning the exclusionary rule is binding on the DHS. See 8 U.S.C. § 1103(a)(1) (providing that the Secretary of Homeland Security "shall be charged with the administration and enforcement of . . . all . . . laws relating to the immigration and naturalization of aliens . . . [p]rovided, however, [t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling").

[7] In unpublished decisions, we have recognized the application of the exclusionary rule in removal proceedings. (Continued)

we are in agreement with those courts that have concluded that the rule applies to egregious violations of the Fourth Amendment.[8]  To hold otherwise would give no effect to the language used by the Supreme Court in Lopez-Mendoza expressing concern over fundamentally unfair methods of obtaining evidence and would ignore the fact that eight justices in Lopez-Mendoza seem to have agreed that the exclusionary rule applies in removal proceedings in some form.  Moreover, even assuming the Court's limitation in Lopez-Mendoza could be construed as dicta, we simply cannot ignore the import of the language used by the Supreme Court in that case.  See United States v. Fareed, 296 F.3d 243, 247 (4th Cir. 2002) (following "dictum endorsed by six justices" of the Supreme Court and citing Gaylor v. United States, 74 F.3d 214, 217 (10th Cir. 1996) (stating that federal appellate court is "'bound by Supreme Court dicta almost as firmly as by the Court's outright holdings'")).  Accordingly, we

---

See, e.g., Samuels v. INS, 993 F.2d 1539, at *1 (4th Cir. 1993) (unpublished) ("We reject Samuels' arguments that her confession should have been suppressed because of alleged Fifth Amendment violations.  The Supreme Court has made clear that the exclusionary rule does not apply in civil deportation cases, absent 'egregious' constitutional violations. . . .  We perceive no egregious violations here." (footnote omitted)).

[8] All of Yanez's egregiousness claims pertain to alleged Fourth Amendment violations.  Consequently, we do not decide what "other liberties" fall within the egregiousness exception. Lopez-Mendoza, 468 U.S. at 1050.

hold that the exclusionary rule applies in removal proceedings where the challenged evidence has been obtained by "egregious violations of [the] Fourth Amendment . . . that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." Lopez-Mendoza, 468 U.S. at 1050-51.

Under this holding, an alien seeking the application of the exclusionary rule to a Fourth Amendment claim in a removal hearing faces two hurdles at the prima facie case stage. First, she must allege facts that state a violation of her rights under the Fourth Amendment. Oliva-Ramos, 694 F.3d at 275. Second, the alien must show that the alleged violation of the Fourth Amendment was egregious. Id. To get an evidentiary hearing, the alien must satisfy both prongs. See Maldonado, 763 F.3d at 162 ("Petitioners were required to proffer affidavits based on personal knowledge that, taken as true, could support suppression. Had their affidavits been sufficient, they would have had an opportunity to confirm those allegations in an evidentiary hearing."). If an evidentiary hearing is warranted, the alien will have the opportunity to present testimony and evidence in support of her Fourth Amendment claim. Id. Upon the establishment of a prima facie case, the burden of proof shifts to the government to demonstrate why the IJ should admit the challenged evidence. Id.

A court reviewing the alien's claim may, but is not required to, address both the constitutional and egregiousness prongs. Like a § 1983 qualified immunity inquiry, the court can choose to decline to address whether a Fourth Amendment violation has occurred and first address whether the egregiousness prong has been satisfied. See, e.g., Martinez Carcamo v. Holder, 713 F.3d 916, 922 (8th Cir. 2013) (holding that alleged Fourth Amendment violations were not egregious and declining to address whether Fourth Amendment violations had occurred); Martinez-Medina v. Holder, 673 F.3d 1029, 1034 (9th Cir. 2011) ("However, we need not and do not decide whether the seizure violated Petitioners' Fourth Amendment rights because we conclude that, even if the seizure violated Petitioners' Fourth Amendment rights, the violation was not egregious."); see also Pearson v. Callahan, 555 U.S. 223, 235-37 (2009) (explaining that, in deciding the question of § 1983 qualified immunity, the court may, but is not required to, address both the constitutional and clearly established prongs; rather, it may decide the case solely on the clearly established prong). Thus, if the alien fails to allege facts sufficient to show that an immigration official has violated the Fourth Amendment, relief can be denied alone on that basis. Cf. Evans v. Chalmers, 703 F.3d 636, 646 (4th Cir. 2012) ("[I]f a plaintiff fails to allege that an official has violated any right, the

- 33 -

official 'is hardly in need of any immunity and the analysis ends right then and there.'" (quoting Abney v. Coe, 493 F.3d 412, 415 (4th Cir. 2007))). Alternatively, relief can be denied where the alien fails to allege facts that an immigration official egregiously violated the Fourth Amendment. See Maldonado, 763 F.3d at 160 ("The affidavits in this case do not suggest egregious constitutional violations, and therefore could not support a basis for excluding the evidence." (brackets, citation, and internal quotation marks omitted)). If there is an evidentiary hearing on the alien's claim, relief can be denied if the alien fails to meet her evidentiary burden on either prong. Oliva-Ramos, 694 F.3d at 279.

D

As noted above, an alien seeking to invoke the exclusionary rule in a removal proceeding must demonstrate: (1) a violation of her Fourth Amendment rights; and (2) that the violation was egregious. While the standard for establishing the constitutional violation prong is straightforward--alleging facts establishing a violation of the Fourth Amendment, Chalmers, 703 F.3d at 646--the standard for establishing the egregiousness prong is not so straightforward. The confusion, and hence uncertainty, stems from Part V of Lopez-Mendoza.

Part V of Lopez-Mendoza sanctions the application of the exclusionary rule in cases where the evidence was obtained as a result of "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." 468 U.S. at 1050–51. The exact meaning of this statement is far from clear.

The plain meaning of this statement suggests that the Fourth Amendment violation must "transgress notions of fundamental fairness" **and** "undermine the probative value of the evidence obtained." Id. However, closer inspection of the context of this statement reveals that the Supreme Court meant to use the disjunctive "or" instead of the conjunctive "and" to create two avenues of relief instead of one such avenue. In other words, an **egregious** violation of the Fourth Amendment is: (1) a violation of the Fourth Amendment that transgresses notions of fundamental fairness; **or** (2) a violation of the Fourth Amendment that, regardless of the violation's unfairness, undermines the probative value of the challenged evidence. See Oliva-Ramos, 694 F.3d at 278 (concluding that an egregious constitutional violation involves either a constitutional violation that was fundamentally unfair or, alternatively, a constitutional violation that, regardless of

its unfairness, undermined the probative value of the obtained evidence); Almeida-Amaral, 461 F.3d at 234 ("The [Lopez-Mendoza] Court, seemingly inadvertently, used the conjunctive 'and' instead of the disjunctive 'or' to link these two possible grounds for deeming a violation egregious."); Gonzalez-Rivera, 22 F.3d at 1451 (holding that a "fundamentally unfair Fourth Amendment violation is considered egregious regardless of the probative value of the evidence obtained").

To be sure, the Lopez-Mendoza Court justified its exception for egregious constitutional violations by citing four cases in which the evidence was reliable (and therefore its probative value was not undermined), but nevertheless suppressible because its admission was fundamentally unfair. The first case cited was Rochin v. California, 342 U.S. 165 (1952). There, police officers obtained probative evidence of Rochin's drug involvement by forcing him to ingest an emetic solution to induce vomiting so they could recover recently swallowed morphine capsules. Id. at 166. The Court held that the probative evidence was illegally obtained because the method used offended even "hardened sensibilities" and "shocks the conscience" of the Court. Id. at 172. In no uncertain terms, the Court in Rochin opined that reliability is not the sole touchstone of the Fourth Amendment. Id. at 173 (noting that coerced confessions are inadmissible in criminal trials "even

though statements contained in them may be independently established as true" principally because they "offend the community's sense of fair play and decency"). Thus, it was the tactics of the police, not the reliability of the obtained evidence, that led to the exclusion of the evidence in Rochin.

The three remaining cases concerning egregiousness cited by the Lopez-Mendoza Court were BIA decisions, Matter of Toro, 17 I. & N. Dec. 340 (BIA 1980); Matter of Garcia, 17 I. & N. Dec. 319 (BIA 1980); and Matter of Ramira-Cordova, No. A21 095 659 (BIA Feb. 21, 1980) (unpublished). In each of these cases, the BIA decision did not focus on the reliability of the evidence. Rather, the decision focused on whether the admission of the contested evidence would be fundamentally fair. See Matter of Toro, 17 I. & N. Dec. at 343-44 (suggesting that a stop based on Hispanic appearance alone would constitute an egregious Fourth Amendment violation if the Border Patrol officers acted in bad faith, regardless of the probative value of the evidence obtained); Matter of Garcia, 17 I. & N. Dec. at 320-21 (excluding statements obtained after agents repeatedly ignored detainee's request for counsel); Matter of Ramira-Cordova, No. A21 095 659, slip op. at 3-4 (suppressing evidence obtained as a result of a nighttime warrantless entry into the aliens' residence).

The Lopez-Mendoza Court's use of the cited authority only

makes sense if fundamental unfairness is not tethered to the probative value of the evidence obtained.  As noted by the court in Orhorhaghe v. INS, "[w]ere the rule to the contrary, the egregiousness exception would have little meaning, for the fruits of an illegal search or seizure ordinarily consist of physical evidence, the reliability of which is in no way affected by the manner in which the evidence is obtained."  38 F.3d 488, 501 (9th Cir. 1994).  Given this, it is no surprise that the three circuits to have meaningfully considered the unsettled "and/or" issue raised by Part V of the Lopez-Mendoza opinion have opted to replace the opinion's "and" with an "or" to create a workable, disjunctive standard.  Oliva-Ramos, 694 F.3d at 278; Almeida-Amaral, 461 F.3d at 234; Gonzalez-Rivera, 22 F.3d at 1451; but see Lopez-Rodriguez v. Holder, 560 F.3d 1098, 1105 (9th Cir. 2009) (Bea, J., dissenting from the denial of rehearing en banc) ("Finally, the Mendoza dicta seems to posit a conjunctive test.  To trigger application of the exclusionary rule, the egregious conduct must both (1) transgress notions of fundamental fairness and (2) undermine the probative value of the evidence obtained." (emphasis, footnote, citation, and internal quotation marks omitted)).

In our case, Yanez does not challenge the probative value of the evidence obtained as a result of the alleged wrongful search, seizure, and questioning.  Consequently, the challenged

evidence cannot be excluded on the basis that its probative value is undermined by the activities of the ICE agents. Rather, the challenged evidence can only be excluded if the actions of the agents amounted to a violation of the Fourth Amendment that transgresses notions of fundamental fairness. This begs the question: When does a violation of the Fourth Amendment transgress notions of fundamental fairness?  We turn to this question next.

2

A review of the case law demonstrates that there is no consensus on when a violation of the Fourth Amendment is egregious such that it transgresses notions of fundamental fairness.  However, two different approaches to assessing egregiousness have emerged in the fact-specific case law.  The first is the qualified immunity approach, which is applied in the Ninth Circuit.  The second is the totality of the circumstances approach, which is applied in the Second, Third, and Eighth Circuits.[9]

a

---

[9] Other circuits have raised and disposed of claims of egregiousness without setting out a detailed standard.  See, e.g., Kandamar, 464 F.3d at 74 (refusing to find egregiousness); United States v. Olivares-Rangel, 458 F.3d 1104, 1118 n.11 (10th Cir. 2006) (citing the Lopez-Mendoza examples of egregiousness); Navarro-Chalan v. Ashcroft, 359 F.3d 19, 23 (1st Cir. 2004) (refusing to find egregiousness for voluntary statements made by alien while not in custody).

The Ninth Circuit's qualified immunity approach is the most alien-friendly test for egregiousness, linking the inquiry to a qualified immunity analysis. In Gonzalez-Rivera, the Ninth Circuit held that all "bad faith" violations of the Fourth Amendment are egregious, warranting the application of the exclusionary rule. 22 F.3d at 1449 & n.5. A bad faith Fourth Amendment violation occurs when "evidence is obtained by deliberate violations of the [F]ourth [A]mendment, or by conduct a reasonable officer should have known is in violation of the Constitution." Id. at 1449 (emphasis omitted). Applying that standard in Gonzalez-Rivera, the court held that stopping an individual based solely on a person's race constitutes an egregious violation of the Fourth Amendment because "the officers should have known that their decision to stop [the alien] based solely on his Hispanic appearance was unconstitutional." Id. at 1450.

In another case, the Ninth Circuit found an egregious violation where officers entered a home without trying to procure a warrant, without exigent circumstances, and without consent, because "reasonable officers should have known that they were violating the Fourth Amendment." Lopez-Rodriguez v. Mukasey, 536 F.3d 1012, 1018 (9th Cir. 2008). In the court's view, "reasonable officers would not have thought it lawful to push open the door to petitioners' home simply because [the

petitioner] did not 'tell them to leave or [that] she did not want to talk to them.'" Id.

Building on Lopez-Rodriguez, the Ninth Circuit in Martinez-Medina noted that whether "a reasonable officer should have known his conduct violated the Constitution depends in part on whether the constitutional right was clearly established in the particular context at issue." 673 F.3d at 1034. There, a deputy sheriff was told by two Mexican nationals that they were illegally present in the United States. Id. at 1031. The deputy sheriff detained them solely by verbal instruction until an immigration officer arrived. Id. at 1031-32. The aliens admitted to the immigration officer that they were illegally present in the United States. Id. at 1032. The Martinez-Medina court found no egregious violation of the aliens' Fourth Amendment rights because "a reasonable officer would not have known he lacked probable cause to detain Petitioners." Id. at 1035. In the court's view, "the deputy sheriff, unlike the officers in Lopez-Rodriguez, was not acting against an unequivocal doctrinal backdrop." Id. In other words, because the "law was unclear as to whether an alien's admission to being illegally present in the United States created probable cause to seize the alien for violating federal immigration law," there was no egregious violation of the aliens' Fourth Amendment rights. Id.

On the other end of the spectrum is the totality of the circumstances approach. In Oliva-Ramos, the Third Circuit criticized the Ninth Circuit's linking of the exclusionary rule in removal cases to the qualified immunity standard. Oliva-Ramos, 694 F.3d at 277. The court said that it could not adopt an egregiousness standard that is "perched on the fulcrum of the good faith of the police." Id. The Third Circuit noted that the Ninth Circuit's test would "permit conduct that may be objectively reasonable based on directives of the [DHS], but nevertheless result in routine invasions of the constitutionally protected privacy rights of individuals." Id. Finding such a result untenable, the court in Oliva-Ramos indicated that the egregiousness analysis "must, by its very nature, differ from an inquiry into an officer's good faith." Id. at 259 n.21.

In Oliva-Ramos, the alien alleged several Fourth Amendment violations, including that the officers lacked proper consent before entering his apartment at 4:30 a.m., arrested him without probable cause or a warrant, and seized him without reasonable suspicion. Id. at 261-62. The BIA denied the alien's request to supplement the record with new, previously unavailable evidence of widespread Fourth Amendment violations and egregious conduct, concluding that Part V of Lopez-Mendoza was only dicta. Id. at 262-70. On the ensuing petition for review, the

Third Circuit vacated the BIA's decision and required it to reopen the proceedings so that the alien could present evidence of widespread and egregious conduct. Id. at 274-82.

The court in Oliva-Ramos opined that "evidence will be the result of an egregious violation within the meaning of Lopez-Mendoza, if the record evidence establishes" that a Fourth Amendment violation that was fundamentally unfair had occurred. Id. at 278. In setting the contours of this standard, the Oliva-Ramos court discerned "guiding principles" from the Second Circuit's decision in Almeida-Amaral. Id. First, "courts and agencies must adopt a flexible case-by-case approach for evaluating egregiousness, based on a general set of background principles which fulfill the two-part Lopez-Mendoza test." Id. at 278-79. Second, fact-finders who "evaluat[e] the egregiousness of the violation should pay close attention to the 'characteristics and severity of the offending conduct.'" Id. at 279 (citation and internal quotation marks omitted). Quoting the First Circuit's decision in Kandamar and the Eight Circuit's decision in Puc-Ruiz, the Oliva-Ramos court explained that "'evidence of any government misconduct by threats, coercion or physical abuse' might be important considerations in evaluating egregiousness," id. (quoting Kandamar, 464 F.3d at 71), and "evidence of 'physical brutality'" and an "'unreasonable show or use of force'" also may be relevant, id. (quoting Puc-Ruiz, 629

F.3d at 778-79).  Succinctly put, the Oliva-Ramos court concluded that "there is no one-size-fits-all approach to determining whether a Fourth Amendment violation is egregious" and that the Supreme Court in Lopez-Mendoza did not "suggest or imply that any strict test-based approach is appropriate or warranted."  Id.  Rather, the totality of the circumstances should guide the analysis, and the court required the BIA to consider on remand factors such as:

> [W]hether Oliva-Ramos can establish intentional violations of the Fourth Amendment, whether the seizure itself was so gross or unreasonable in addition to being without a plausible legal ground, (e.g., when the initial illegal stop is particularly lengthy, there is an unnecessary and menacing show or use of force, etc.), whether improper seizures, illegal entry of homes, or arrests occurred under threats, coercion or physical abuse, the extent to which the agents re[s]orted to unreasonable shows of force, and finally, whether any seizures or arrests were based on race or perceived ethnicity.

Id.  The court further explained that its list of factors was merely "illustrative . . . and not intended as an exhaustive list of factors that should always be considered, nor is any one factor necessarily determinative of the outcome in every case. Rather, the familiar totality of the circumstances must guide the inquiry and determine its outcome."  Id.

Because the court in Oliva-Ramos took "no position . . . on the underlying question of whether the circumstances here are so egregious . . . as to justify a suppression order," id. at 282,

- 44 -

it did not apply the totality of the circumstances test. Instead, the court remanded the case to allow the alien to marshal evidence concerning widespread and egregious Fourth Amendment violations. Id.

The Second Circuit's case law is in line with that of the Third Circuit. In Almeida-Amaral, a border patrol agent stopped a Brazilian national. 461 F.3d at 232. The court found a Fourth Amendment violation because the arresting agent had no legitimate basis for stopping the alien. Id. at 236. However, these facts were not sufficient to find an egregious violation requiring exclusion of the evidence obtained following the stop. Id. The court concluded that stopping the alien without "valid reason or suspicion" constituted a Fourth Amendment violation but was not egregious because it was not "particularly lengthy" and there was no show of force. Id. According to the court, egregiousness must be gauged "based on the characteristics and severity of the offending conduct. Thus, if an individual is subjected to a seizure for no reason at all, that by itself may constitute an egregious violation, but only if the seizure is sufficiently severe." Id. at 235. Thus, like the Third Circuit, the Second Circuit's egregiousness approach involved an assessment of the totality of the objective facts in the record.

The Second Circuit followed Oliva-Ramos in its decision

in Cotzojay. In that case, an alien from Guatemala, who was seized by ICE agents at his home in Riverhead, New York at approximately 4:00 a.m., asserted that his Fourth Amendment rights, among others, had been violated and thus endeavored to exclude the evidence obtained by ICE as a result of the seizure, including a Form I-213, his passport, and his statements to the agents. 725 F.3d at 174-77. Of note, the agents did attempt to obtain a warrant to enter the alien's home, and they entered the home without the alien's consent or exigent circumstances. Id. at 174, 177. The IJ and the BIA refused to suppress the challenged evidence because the alien did not claim he was "physically threatened or harmed in the course of the nighttime, warrantless raid." Id. at 179.

On appeal, the Second Circuit vacated and remanded the case to the BIA. Id. at 184. The court first observed that it had never found a violation sufficiently severe to meet the egregious standard in a removal case. Id. at 180. The court then moved to the uncontroversial proposition that the Fourth Amendment applies to aliens and citizens alike. Id. at 181. The court noted that, in the absence of consent or exigent circumstances, the Supreme Court has consistently held that an entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant. Id. In the court's view, "if a Fourth Amendment

- 46 -

violation is measured by what is reasonable, then an egregious violation must surely be something more than unreasonable." Id. at 182. In fact, the court observed that the test for egregiousness is more demanding than the test for overcoming qualified immunity. Id. at 183 n.10.[10] The court agreed that the Third Circuit's list of factors may be useful for determining whether a Fourth Amendment violation is sufficiently egregious to require application of the exclusionary rule, adding that no "single aspect of a constitutional violation elevates its status from merely unreasonable to egregious." Id. at 183. The court observed that,

> although an unlawful search does not become an egregious search merely because it invades the privacy of the home, . . . that government agents intrude into one's home (versus a workplace or vehicle, for example) is an important factor in assessing the egregiousness of a Fourth Amendment violation because the home is where its protections should be at their peak.

Id. (alteration, citation, and internal quotation marks omitted).

Applying the totality of the circumstances standard, the Cotzojay court held that "the deliberate, nighttime, warrantless entry into an individual's home, without consent and

---

[10] The Cotzojay court rejected the Ninth Circuit's qualified immunity approach because the court found that approach too broad in that it places "too much emphasis on the good or bad faith of government agents." 725 F.3d at 183 n.10.

in the absence of exigent circumstances, may constitute an egregious Fourth Amendment violation regardless of whether government agents physically threaten or harm residents." Id. According to the court, its egregious Fourth Amendment violation holding was further supported by other objective evidence, namely, that the ICE agents "pounded" on the alien's bedroom door following the home entry, "corralled" the alien and "other handcuffed residents in the living room," searched the alien's "room for desirable identification documents, informed arrestees that they could relieve themselves in a restaurant parking lot while [the agents] ate breakfast, and, in total, detained [the alien] for approximately eighteen hours." Id. at 183-84 n.12. As a result, the court remanded the case for further proceedings to give the government a meaningful opportunity to show that its officers obtained consent to enter the home. Id. at 183-84.

In Maldonado, the Second Circuit stressed the difficulty of establishing a prima facie case of egregiousness. In that case, aliens from Ecuador were among persons gathered in a park in Danbury, Connecticut, to seek work. 763 F.3d at 158. The Danbury Police Department (DPD) and the ICE were jointly conducting an operation in that area. Id. The aliens entered an unmarked vehicle operated by an undercover DPD officer (with the expectation that they were destined to a work-site). Id. The aliens were arrested, and their incriminating statements

- 48 -

about their alienage were memorialized on Form I-213s. Id. Before the IJ, the aliens moved to suppress the Form I-213s and to terminate the removal proceedings based on Fourth Amendment violations, arguing that the ICE agents seized them without reasonable suspicion and on the basis of their race. Id. The IJ concluded that the aliens did not make out a prima facie case and denied the motion. Id. Following the BIA's affirmance, the aliens sought review in the Second Circuit. Id.

In denying the petition for review, the Maldonado court emphasized that a removal hearing was designed to provide a quick method of determining an alien's eligibility to remain in the country. Id. at 159. As for the contours of the egregiousness standard, the court observed that "'egregious' by definition is very bad indeed." Id. Thus, according to the court, the egregiousness standard is "stringent" and "entails a shock to the conscience." Id.; see also id. at 165 ("Something egregious is by nature extreme, rare, and obvious."). Applying the totality of the circumstances standard, the court found no egregious Fourth Amendment violations. Id. at 160-63. In so holding, the court noted that the affidavit in Cotzojay was deemed to satisfy the egregiousness standard "because it averred facts that were appalling under any standard: a deliberate, nighttime, warrantless entry into an individual's home without consent and in the absence of exigent circumstances." Id. at

160 (citation and internal quotation marks omitted). Contrasting the facts in Cotzojay to the facts before it, the court pointed out that the aliens did not allege that they were treated in a particularly severe manner and found nothing in their account suggesting that they were "gathered by the authorities, let alone that they were selected by the authorities on the basis of race." Id. at 161. Rather, the court declared that the aliens "self-selected on the basis of their willingness to seek and accept day labor." Id.

The Eighth Circuit's case law is in line with that of the Second and Third Circuits. In Puc-Ruiz, the Eighth Circuit affirmed a removal order issued by the BIA, which upheld a decision by the IJ, who refused to suppress evidence obtained following the alien's apprehension by a local police officer. 629 F.3d at 775-83. There, the alien, a native and citizen of Mexico, was arrested at a restaurant by local police, who were responding to a tip that the restaurant was serving alcohol in violation of a municipal ordinance. Id. at 775. The police entered the restaurant without a warrant and asked the patrons to produce identification. Id. After the alien presented his valid Missouri driver's license, he was arrested and transported to the police station, where he was fingerprinted and detained. Id. After he was taken into ICE custody, the alien was interviewed, resulting in the preparation of a Form I-

213.  Id. at 775-76.  Before the IJ, the alien moved to suppress the evidence resulting from his arrest, including the Form I-213, on the basis that his arrest violated the Fourth Amendment.  Id. at 776.

On review in the Eighth Circuit, the Puc-Ruiz court held that the police conduct at issue did not rise to the level of an egregious Fourth Amendment violation.  Id. at 778-79.  The court acknowledged that egregious violations are not limited to those of physical brutality and cited to the principle that the lack of any valid basis whatsoever for a seizure sets the stage for egregiousness, but more than that single factor would be needed.  Id.  The court indicated that there was no evidence in the record that the local police employed an unreasonable show of force.  Id. at 779.  It emphasized that the alien did not advance any argument that the decision to arrest him was based on race or appearance, such as to trigger an egregious violation, as has been recognized in other circuit court decisions.  Id.  The court considered that this was not a case in which police officers invaded private property and detained individuals with no articulable suspicion whatsoever.  Id.[11]

In Martinez Carcamo, the Eighth Circuit rejected the

_____

[11] The Puc-Ruiz court also rejected the alien's due process claim on the basis that the statements were voluntarily made. 629 F.3d at 779-80.

- 51 -

aliens' challenge to the IJ's denial, and the BIA's affirmance, of their motion to suppress. 713 F.3d at 922-26. The motion to suppress challenged the warrantless entry into the aliens' trailer home "[b]efore approximately" 6:00 a.m. on the basis that a warrantless entry into a home egregiously violates the Fourth Amendment. Id. at 918. Before entering the home, the ICE agents took away one man's cell phone while he was trying to make a call, and, after entering, pulled a blanket off another man lying in his bed. Id. at 918-19. In upholding the denial of the motion to suppress the passports the agents obtained as a result of the warrantless entry, the court applied the totality of circumstances approach outlined in Oliva-Ramos. Id. at 923.[12] Under that standard, the court found that the agents' entry into the home was not an egregious Fourth amendment violation "because nothing in our previous cases indicates that an unreasonable search becomes an egregious search merely because it invades the privacy of the home." Id. The court further found that the aliens' allegations that they were targeted on

_____

[12] The Martinez Carcamo court noted that it previously had rejected the Ninth Circuit's qualified immunity approach in Garcia-Torres v. Holder, 660 F.3d 333 (8th Cir. 2011). Martinez Carcamo, 713 F.3d at 923. In Garcia-Torres, the Eighth Circuit rejected the Ninth Circuit's approach because "[s]uch a standard would likely eviscerate Lopez–Mendoza insofar as the Fourth Amendment prohibits only 'unreasonable' searches and seizures and the Ninth Circuit's standard applies whenever 'a reasonable officer should have known' his conduct was illegal." Garcia-Torres, 660 F.3d at 337 n.4.

account of their race were speculative.  Id.

In Lopez-Fernandez v. Holder, the Eighth Circuit denied a petition for review of a removal order issued by the BIA, which upheld a decision by the IJ, who refused to suppress evidence obtained following the aliens' apprehension by ICE agents who went to the aliens' home following relevant information the agents received from a named informant.  735 F.3d 1043, 1045 (8th Cir. 2013).  Prior to the 7:00 a.m. entry, the agents did not attempt to procure a warrant.  Id. at 1044-45.  Rather, they "forced" their warrantless entry after one of the aliens opened the front door.  Id. at 1044.  In resolving the aliens' Fourth Amendment claim, the court assumed the entry into the home violated the Fourth Amendment.  Id. at 1046.  Applying the totality of the circumstances test, the court held, citing Puc-Ruiz, Garcia-Torres, and Martinez Carcamo, that the aliens had not established that the assumed Fourth Amendment violation was sufficiently egregious to justify suppression of the government's evidence, including Form I-213s and the aliens' passports.  Id. at 1047-48.  In so holding, the court found two facts particularly relevant.  First, there was "no evidence of egregious force in the manner of entry."  Id. at 1048.  Second, the search occurred in the "morning when the Petitioners were already awake, not in the middle of the night" as in Cotzojay.  Id.

Our survey of the case law from the Ninth Circuit on the one hand and the Second, Third, and Eighth Circuits on the other, informs us that we should align ourselves with the Second, Third, and Eighth Circuits and apply a totality of the circumstances test.

Any analysis into the appropriate egregiousness standard should begin with the recognition that a removal hearing is intended to "provide a streamlined determination of eligibility to remain in this country, nothing more." Lopez-Mendoza, 468 U.S. at 1039. As the Supreme Court noted in Lopez-Mendoza, the removal hearing system is designed to "permit the quick resolution of very large numbers of deportation actions, . . . [and] [t]he prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character" of removal hearings. Id. at 1048. Considering the views espoused by the Supreme Court, especially its admonishment that we do not change and complicate the character of removal proceedings, it is evident that a suppression hearing in a removal proceedings is, at most, supposed to be a very rare occurrence. Cf. Maldonado, 763 F.3d at 167 (noting that invocation of the exclusionary rule in removal proceedings should not be a "common-place tactic"). Thus, to stay faithful to the dictates of the Supreme Court, it follows that an alien's

evidentiary proffer concerning egregiousness must be high, otherwise a suppression hearing on the question of egregiousness would be commonplace, and the very heart of the Lopez-Mendoza decision would be undermined. Cf. id. at 159 (noting that "'egregious' by definition is very bad indeed"); Garcia-Torres, 660 F.3d at 336 (noting that an egregious violation must be more than a "mere garden-variety" violation); Almeida-Amaral, 461 F.3d at 235 (noting that, "if an individual is subjected to a seizure for no reason at all, that by itself may constitute an egregious violation, but only if the seizure is sufficiently severe" (emphasis omitted)).

The Ninth Circuit's approach requires a suppression hearing any time an alien alleges that the law enforcement officers acted in bad faith. This sets the evidentiary proffer bar too low. Bad faith allegations often are difficult to resolve without an evidentiary hearing because the outcome turns on the subjective motivations of the law enforcement officers. It is easy to see how the bad faith standard can be manipulated by clever lawyers and encourages aliens to file frivolous improper motivation claims. Thus, we see the Ninth Circuit's standard as stymieing, rather than promoting, the streamlined nature of the removal hearing process as recognized by the Court in Lopez-Mendoza. Relatedly, the Ninth Circuit's standard runs the risk of routinely requiring the arresting law enforcement officer to

appear at a suppression hearing to testify concerning motivation, which the Court noted in Lopez-Mendoza would unacceptably burden the administration of the immigration laws. 468 U.S. at 1049.

The Ninth Circuit's standard is inconsistent with Lopez-Mendoza on another front. The cases cited by the Lopez-Mendoza Court in support of the egregiousness exception, in particular Rochin, turned on the conduct of the law enforcement officers not on the knowledge or intent of the law enforcement officers. The Court in Rochin did not resolve the case on the basis of what the law enforcement officers knew or intended, but rather what they did--they forcibly arrested the defendant and obtained inculpatory evidence without his consent by forcing a tube down his throat to pump his stomach. 342 U.S. at 166. Thus, the outcome of the egregiousness inquiry does not solely turn on the knowledge or intent of law enforcement officers, though intent may be one among other relevant factors. See Oliva-Ramos, 694 F.3d at 279 (noting that intent may be one among many other factors to be considered under the totality of the circumstances). Yet, the Ninth Circuit's standard permits the application of the exclusionary rule in a removal proceeding any time law enforcement officers knowingly or intend to violate the Fourth Amendment regardless of the severity of their conduct. Eliminating the severity of the law

enforcement officers' conduct essentially guts the definition of egregiousness envisioned by the Court in Lopez-Mendoza. Cf. Martinez Carcamo, 713 F.3d at 923 ("We decline to allow the Fourth Amendment rights of citizens or aliens to turn on a federal agent's personal state of mind.").

The Ninth Circuit's approach faces another obstacle as well. As noted by the court in Oliva-Ramos, the Ninth Circuit's approach allows law enforcement officers a free pass any time they unconstitutionally act pursuant to an agency regulation. 694 F.3d at 277. Such a standard makes little sense because potentially it permits "routine invasions of the constitutionally protected privacy rights of individuals," id., by allowing law enforcement officers to invade such interests pursuant to an agency regulation that permits unconstitutional conduct.

In our view, the sounder egregiousness approach is the totality of the circumstances standard as applied in the Second, Third, and Eighth Circuits. This standard is a flexible case-by-case standard, taking into account a variety of factors. Id. It allows the court to examine all of the facts it deems relevant to the egregiousness inquiry and focuses on the unreasonableness of the conduct of the law enforcement officers. Id. at 276, 278. Factors a court may consider include: (1) whether the Fourth Amendment violation was

intentional; (2) whether the violation was unreasonable in addition to being illegal; (3) whether there were threats, coercion, physical abuse, promises, or an unreasonable show of force by the law enforcement officers; (4) whether there was no articulable suspicion for the search or seizure whatsoever; (5) where, when, and how the search, seizure or questioning took place; (6) whether the search, seizure, or questioning was particularly lengthy; (7) whether the law enforcement officers procured an arrest or search warrant; (8) any unique characteristics of the alien involved; and (9) whether the violation was based on racial considerations. Maldonado, 763 F.3d at 159-60; Oliva-Ramos, 694 F.3d at 279; Puc-Ruiz, 629 F.3d at 779; Kandamar, 464 F.3d at 71. This list is not meant to be exhaustive, as there is "no one-size-fits-all approach to determining whether a Fourth Amendment violation is egregious." Oliva-Ramos, 694 F.3d at 279. The facts of each case will dictate the relevant factors for consideration. Importantly, the alien's evidence, in its totality, must support a basis to suppress the challenged evidence under a finding of egregiousness, even at the prima facie case stage. Such evidence cannot be based on intuition or speculation, especially as it relates to the intent of law enforcement officers. See Maldonado, 763 F.3d at 161 (noting the danger of vague "improper motivation" allegations); Lopez-Gabriel v.

<u>Holder</u>, 653 F.3d 683, 686 (8th Cir. 2011) (no suppression hearing required where the alien stated only that he "feels" the police stopped him because of his race, and he "believe[d]" the police treated him differently than they would "treat white people"). Suppression hearings should be the exception, not the rule in removal proceedings, so the alien's evidentiary burden, even at the <u>prima facie</u> case stage, is high. <u>Lopez-Mendoza</u>, 468 U.S. at 1049-50.

E

With the appropriate standard set forth, we can proceed to address the substance of Yanez's Fourth Amendment claims.[13]

1

Yanez raises three Fourth Amendment particularity claims. First, she claims that the search warrant was invalid because it

---

[13] Because Yanez abandoned before the BIA her claim that the alleged constitutional violations she experienced were part of a larger, widespread pattern of unconstitutional misconduct by ICE agents, we decline to address the merits of her Fourth Amendment widespread pattern claim. <u>See</u> <u>Kporlor v. Holder</u>, 597 F.3d 222, 226 (4th Cir. 2010) ("It is well established that an alien must raise each argument to the BIA before we have jurisdiction to consider it." (internal quotation marks omitted)); <u>Massis v. Mukasey</u>, 549 F.3d 631, 638-40 (4th Cir. 2008) ("[U]nder 8 U.S.C. § 1252(d)(1), an alien's failure to dispute an issue on appeal to the BIA constitutes a failure to exhaust administrative remedies that bars judicial review."); <u>see also</u> <u>Rodriguez-Benitez v. Holder</u>, 763 F.3d 404, 405 (5th Cir. 2014) ("The REAL ID Act of 2005 grants this Court subject-matter jurisdiction over constitutional claims and questions of law that were exhausted before the BIA." (footnote and internal quotation marks omitted)).

identified the Premises as a single-family home when it was, in fact, a multi-unit dwelling. Alternatively, she claims that, once the agents entered the Premises, they should have realized that the Premises was a multi-unit dwelling, and, at that point, they should have stopped the search immediately because the warrant was overbroad. Finally, she claims the ICE agents were required to list her as an item to be seized in the warrant. We reject these claims for the simple reason that they do not make out a constitutional violation, let alone an egregious one.[14]

---

[14] We note that neither the IJ nor the BIA specifically addressed Yanez's particularity claims. Ordinarily, such an error would require a remand to the BIA for further proceedings pursuant to SEC v. Chenery Corp., 318 U.S. 80 (1943). Under Chenery, generally we may only affirm on the grounds relied on by the BIA and may not affirm on unstated alternate grounds. Id. at 94-95. Chenery is based on the proposition that, unlike lower courts, agencies exercise their discretion as the repositories of a Congressionally-delegated power to make policy; thus, just as an appellate court cannot take the place of a jury in finding facts, it may not take the place of an agency in advancing a rationale for agency action. Id. at 88. However, where, as here, we are dealing with a purely legal conclusion, that is, whether Yanez has established a prima facie case, a remand is not compelled. See Hussain v. Gonzales, 477 F.3d 153, 158 (4th Cir. 2007) (no remand required where the record was conclusive that the alien failed to establish a prima facie case for adjustment of status); cf. N.C. Comm'n of Indian Affairs v. U.S. Dep't of Labor, 725 F.2d 238, 240 (4th Cir. 1984) ("We do not . . . perceive there to be a Chenery problem in the instant case because the question of interpretation of a federal statute is not a determination or judgment which an administrative agency alone is authorized to make." (citation and internal quotation marks omitted)). In this case, the record is complete, Yanez's arguments are fully briefed, and the only question before us is purely a legal one. As in Hussain, a remand to the BIA "would serve no useful purpose," and the
(Continued)

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The requirement for particularity "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Maryland v. Garrison, 480 U.S. 79, 84 (1987). The particularity requirement is satisfied when an officer in possession of a search warrant describing a particular place to be searched can reasonably ascertain and identify the intended place to be searched. United States v. Owens, 848 F.2d 462, 463 (4th Cir. 1988). Even if the description of the place to be searched is mistaken, there is no Fourth Amendment violation when the officers executing the search reasonably believe that the warrant is sufficiently particular and that they are searching the correct location. Garrison, 480 U.S. at 84-89. An erroneous description or a factual mistake in the warrant will not necessarily invalidate the warrant and the subsequent search. Owens, 848 F.2d at 463-64. "The validity of the warrant must be assessed on the basis of the information that

result on remand is a "foregone conclusion." 477 F.3d at 158.

- 61 -

the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." Garrison, 480 U.S. at 85. "Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued." Id.

We conclude that, under the circumstances, the ICE agents conducted a reasonable investigation of the Premises in preparation for obtaining the search warrant, and further conclude that the description of the Premises in the warrant did not invalidate it. The agents placed the Premises under surveillance, and such surveillance revealed that the Premises was occupied by Umana, an illegal alien and El Salvadorian citizen. Based on their surveillance of the Premises, the agents reasonably believed that it was a single-family home, as the picture of the Premises in the record depicts a small, single-story home. The Premises has just one mailbox, with the numbers "402" on it, (J.A. 524), and the land records search did not reflect that the Premises was a multi-unit dwelling. The investigation of the Premises and its description in the warrant unquestionably complied with the dictates of Garrison and Owens. Cf. United States v. Clark, 638 F.3d 89, 96 (2d Cir. 2011) ("'[I]f the [multi-unit] building in question from its outward appearance would be taken to be a single-occupancy structure and neither the affiant nor other investigating

officers nor the executing officers knew or had reason to know of the structure's actual multiple-occupancy character until execution of the warrant was under way, then the warrant is not defective for failure to specify a subunit within the named building.'" (quoting 2 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 4.5(b), at 581-82 (4th ed. 2004))). Accordingly, we reject Yanez's claim that the warrant was invalid because it identified the Premises as a single-family home.

Yanez also claims that, once the ICE agents entered the Premises and approached the bedroom occupied by her and Umana, the agents should have known it was a multi-unit dwelling because the bedroom door was locked. Upon this realization, Yanez claims, the agents immediately should have terminated the search in order to secure a search warrant for Yanez's "separate dwelling." Petitioner's Br. at 32.

The Supreme Court indicated in Garrison that "the validity of the search of respondent's apartment pursuant to a warrant . . . depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." 480 U.S. at 88. "It is only after the police begin to execute the warrant and set foot upon the described premises that they will discover the factual mistake and must reasonably limit their search accordingly." Id. at 89 n.14.

Thus, we must determine whether the ICE agents should have realized this alleged factual mistake during the search and thus stopped the search at that time.

Yanez's claim founders for the simple reason that the ICE agents reasonably believed that the Premises was a single-family home when they arrived at the locked bedroom door. A locked bedroom door in a home does not necessarily mean or imply that the home is a multi-unit dwelling. See United States v. Kyles, 40 F.3d 519, 523–24 (2d Cir. 1994) (permitting the search of a locked bedroom inside a single-family home that did not objectively appear to be a separate unit); United States v. Ayers, 924 F.2d 1468, 1480 (9th Cir. 1991) ("A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that is was issued based on information regarding the alleged illegal activities of one of several occupants of a residence."). Moreover, there is nothing special or unusual about the bedroom door in this case that would have put the agents on notice that it was an entrance to a separate living unit. Along a similar vein, Yanez mentions nothing about the interior of the Premises that would have led the agents to believe that it was a multi-unit dwelling.

In any event, even if the ICE agents were somehow mistaken, and we do not suggest or imply they were, we must make allowances for "honest mistakes that are made by officers in the

- 64 -

dangerous and difficult process of making arrests and executing search warrants." Garrison, 480 U.S. at 87. Unlike Garrison, in which the officers clearly were confronted with two apartments where they expected to find only one, nothing in this case should have made it obvious to the agents that the warrant was overbroad.

Yanez's final claim concerning particularity is that the search warrant is invalid because the affidavit did not list her as an item to be seized. This claim is premised on her claim that the warrant is invalid because the affidavit did not identify the Premises as a multi-unit dwelling and, more particularly, did not identify her separate dwelling unit as a place to be searched. Since we have rejected the premises on which this final claim rests, we reject this claim as well.

2

Yanez also argues that the timing of the execution of the search warrant--5:00 a.m. instead of between 6:00 a.m. to 10:00 p.m.--violated her Fourth Amendment rights. Basically, Yanez contends that the nighttime execution of a daytime warrant violates the Fourth Amendment, absent consent or exigent circumstances, which are not presented here.[15]

---

[15] Understandably, because the record must be viewed in a light most favorable to Yanez, the government does not suggest that exigent circumstances or consent excused the alleged (Continued)

The Fourth Amendment protects individuals from "unreasonable searches and seizures," guaranteeing their right "to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV. That Amendment was specifically crafted to thwart the unbridled discretion of law enforcement officers. Our Founding Fathers intended to impede "the abuses of the general warrants that had occurred in England and of the writs of assistance used in the Colonies." Steagald v. United States, 451 U.S. 204, 220 (1981).[16] General warrants and writs of assistance bestowed upon the executing officials a high degree of deference and, crucially, "provided no judicial check" on a judicial officer's determination that an intrusion into a home or dwelling house was justified. Id. The Founders imposed that missing "judicial check" by adopting the Fourth Amendment, which requires neutral and detached judicial officers to assess

---

failure to timely execute the warrant.

[16] A general warrant, utilized extensively in England before the American Revolution, "specified only an offense . . . and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." Steagald, 451 U.S. at 220. Similarly, a writ of assistance, utilized extensively by the English in the Colonies, "noted only the object of the search--any uncustomed goods--and thus left customs officials completely free to search any place where they believed such goods might be." Id.

whether probable cause has been shown for searches of persons, houses, papers, or effects. Johnson v. United States, 333 U.S. 10, 13-14 (1948). If probable cause exists and is shown under oath, then a judicial officer is entitled to issue a warrant, authorizing the appropriate search.

Though the Fourth Amendment protects against unreasonable searches of persons, houses, papers, and effects, dwelling houses and residences are protected with special jealousy. See Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) ("But when it comes to the Fourth Amendment, the home is first among equals.").[17] The common law viewed "a man's house as his castle of defense and asylum," warranting even greater protection from intrusion. Wilson v. Arkansas, 514 U.S. 927, 931 (1995) (internal quotation marks omitted). Because an individual's expectation of privacy is "at [its] apex in one's home," United States v. Gray, 491 F.3d 138, 146 (4th Cir. 2007), warrantless searches of homes are unconstitutional under the Fourth Amendment, Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006), absent some type of justification. In exceptional

---

[17] The Fourth Amendment's guarantee against unreasonable searches of "houses" extends to owners, boarders, and tenants of homes, apartments, and other dwelling places. United States v. Gray, 491 F.3d 138, 144 (4th Cir. 2007). The Fourth Amendment also protects travelers in hotels and motels, relatives who regularly stay in a residence, and overnight guests. Id.

situations, law enforcement officers may be justified in conducting warrantless searches of homes, particularly in "exigent circumstances." Id. at 403-04.[18] A warrantless search of a home pursuant to an occupant's voluntary consent is also reasonable under the Fourth Amendment. Schneckloth v. Bustamonte, 412 U.S. 218, 219-23 (1973). Absent such justification, however, warrantless searches of dwellings by government agents are "the chief evil against which the wording of the Fourth Amendment is directed." Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (citation and internal quotation marks omitted). The law is thus settled that the Fourth Amendment shields individuals from warrantless intrusions into their homes, even where probable cause otherwise exists to justify searches. Jones v. United States, 357 U.S. 493, 497-98 (1958).

Our nation's historic aversion to the warrantless searches of dwelling houses and residences reaches its zenith when such searches are conducted at night. Nighttime searches have long

---

[18] Exigent circumstances justifying a warrantless search of a home may include, by way of example: fighting a fire and investigating its cause; preventing the imminent destruction of evidence; engaging in "hot pursuit" of a fleeing felon; rendering emergency assistance to an injured occupant; or preventing an occupant from imminent injury. Stuart, 547 U.S. at 403-04; see also Mincey v. Arizona, 437 U.S. 385, 393-94 (1978) ("[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." (internal quotation marks omitted)).

been recognized as more intrusive than searches conducted during the day.  See Coolidge v. New Hampshire, 403 U.S. 443, 477 (1971) (characterizing midnight entry into dwelling as "extremely serious intrusion").  In fact, the Supreme Court has deemed it "difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home."  Jones, 357 U.S. at 498.  That proposition is valid because, during the nighttime hours, searches of dwellings by government agents tend to involve "rousing the residents out of their beds, and forcing them to stand by in indignity in their night clothes," all of which "smack[s] of a police state lacking in the respect for" individual privacy rights.  Gooding v. United States, 416 U.S. 430, 462 (1974) (Marshall, J., dissenting) (citation and internal quotation marks omitted).  Thus, warrantless nighttime searches of homes were characterized by the second Justice Harlan as creating "a grave constitutional question."  Jones, 357 U.S. at 499; see also Monroe v. Pape, 365 U.S. 167, 210 (1961) (Frankfurter, J., dissenting) (describing warrantless nighttime searches of dwellings as "evil in its most obnoxious form").

Rule 41 of the Federal Rules of Criminal Procedure implements the Fourth Amendment's protections against warrantless searches.  Jones, 357 U.S. at 498.  It provides that a judicial officer must issue a search warrant if a federal law

enforcement officer or an attorney for the government presents an affidavit or other information showing probable cause to search a property. Fed. R. Crim. Proc. 41(b)(1). Additionally, Rule 41 sets forth procedures controlling the time at which a warrant may be executed, reflecting that "increasingly severe standards of probable cause are necessary to justify increasingly intrusive searches." Gooding, 416 U.S. at 464. Once issued, a warrant can normally be executed solely "in the daytime," between 6:00 a.m. and 10:00 p.m., "unless the judge for good cause expressly authorizes execution" during the night. Fed. R. Crim. P. 41(e)(2)(A)(ii).[19] Good cause for a nighttime warrant might exist, for example, where necessary to prevent the destruction of evidence. See United States v. Searp, 586 F.2d 1117, 1121 (6th Cir. 1978) ("The Rule recognizes that there are times when a night search is necessary; if, for instance,

---

[19] The relevant inquiry in determining when a search warrant was executed is the time at which the search began, not when it ended. See, e.g., United States v. Keene, 915 F.2d 1164, 1167 (8th Cir. 1990). Furthermore, it is generally recognized that law enforcement officers who properly execute a daytime warrant, between the hours of 6:00 a.m. and 10:00 p.m., may extend their search into the nighttime hours. See, e.g., United States v. Squillacote, 221 F.3d 542, 556 (4th Cir. 2000) ("Because the search of the Appellants' home was commenced in the daytime, as required by the warrant, the FBI agents reasonably could have believed (if their actions after 10:00 p.m. could be considered a search) that it was proper to continue the search into the night."); United States v. Burgard, 551 F.2d 190, 193 (8th Cir. 1977) ("Searches which began during daytime and continued into the night have been held not to violate [Rule 41].").

execution would be impossible in the daytime or the property sought is likely to be destroyed or removed before daylight."). Because of the separate, heightened burden of proof required for issuance of a nighttime warrant, the existence of a daytime warrant ordinarily does not justify a nighttime search. O'Rourke v. City of Norman, 875 F.2d 1465, 1474 (10th Cir. 1989).

b

That a nighttime search would be unconstitutional absent consent or exigent circumstances if it was conducted under color of a daytime warrant is not a novel concept. The Third and Tenth Circuits have reached that very conclusion. See O'Rourke, 875 F.2d at 1474-75 (determining that nighttime search violated Fourth Amendment despite daytime warrant); United States ex rel. Boyance v. Myers, 398 F.2d 896, 899 (3d Cir. 1968) (same); United States v. Merritt, 293 F.2d 742, 746 (3d Cir. 1961) (same). In O'Rourke, the officers obtained a daytime bench warrant to arrest a third party for contempt of court. 875 F.2d at 1467. The officers, however, entered the plaintiff's residence during the nighttime hours and conducted a search, contravening the explicit terms of the warrant. Id. In Boyance, two officers received reports that the petitioner was suspected of committing a burglary. 398 F.2d at 897. Thereafter, at 1:00 a.m., the officers sought a warrant to

search the petitioner's residence.  Id.  The judge issued the warrant, which indicated on its face that the officers were only to "search in the daytime."  Id.  The officers disregarded the terms of the warrant, however, and entered the petitioner's residence at 2:30 a.m.  Id.  Similarly, in Merritt, the officers, after suspecting that the defendant was involved in drug activity, obtained a warrant explicitly limited to the daytime hours but executed it at the defendant's apartment in the nighttime.  293 F.2d at 743.  In each of these cases, the court ruled that the nighttime searches violated the Fourth Amendment.

In reaching their determinations that the nighttime searches violated the Fourth Amendment, the Third and Tenth Circuits focused on the scope of authority conveyed by the explicit terms of the search warrants.  See, e.g., id. at 744 (determining that search warrant's specific limitation "in the daytime" was conclusive).  Because each warrant authorized a daytime search only, the warrant only could be executed during daytime hours.  As the courts of appeals emphasized, to determine otherwise would "completely eviscerate the issuing magistrate's determination of reasonableness," O'Rourke, 875 F.2d at 1474, and would "nullify the requirement of a prior impartial determination that a particular search will be reasonable," Boyance, 398 F.2d at 898-99.

Beyond the Third and Tenth Circuits, it is notable that the Attorney General has taken the position that a daytime warrant does not convey authority to conduct a nighttime search. Jones, 357 U.S. at 496. In Jones, the prosecutors conceded in the district court that, "by the time petitioner's house was searched [by law enforcement officers in the nighttime,] the daytime search warrant had expired." Id. As a result, the Attorney General disclaimed to the Supreme Court that the officers had sought to execute the daytime warrant when they commenced their nighttime search. He contended, however, that the search was nonetheless lawful because there was probable cause to search the home. Id. Both the Fifth Circuit and the Supreme Court accepted the Attorney General's concession that the nighttime search under color of a daytime warrant violated the Fourth Amendment, and, thus, assessed whether the search of a home without a warrant but with probable cause that contraband would be found there violated the Fourth Amendment. See id. (recognizing that officers' "daytime search warrant had expired" when it was executed in nighttime); Jones v. United States, 245 F.2d 32, 34 (5th Cir. 1957) ("[T]he[] [officers] did not execute the day[time] search warrant."). The Court concluded that such a search was not compatible with the Fourth Amendment, reasoning that, if "federal officers [were] free to search without a

- 73 -

warrant merely upon probable cause to believe that certain articles were within a home, the provisions of the Fourth Amendment would become empty phrases, and the protection it affords largely nullified." Jones, 357 U.S. at 498.

d

Following the persuasive decisions of the Third and Tenth Circuits, as well as the Supreme Court's decision in Jones where the Court accepted that the government's concession that a nighttime search conducted pursuant to a daytime warrant violated the Fourth Amendment, we hold that the nighttime execution of a daytime warrant violates the Fourth Amendment, absent consent or exigent circumstances.[20]

In so holding, we note that our court, in an unpublished

---

[20] Although the nighttime execution of a daytime warrant is a Fourth Amendment violation, absent justification, some courts have excused the execution of a search warrant past its expiration date. These courts have inquired into whether the probable cause that supported the warrant's issuance continued to exist at the time of the search. See, e.g., United States v. Burgess, 576 F.3d 1078, 1096-97 (10th Cir. 2009) (deeming search warrant valid forty-four days after expiration date because "[p]robable cause to search was unaffected" by delay). Executing a warrant beyond its facial expiration date where probable cause remains present, however, is materially distinct from seeking to execute a daytime warrant during the nighttime where there is no showing that a nighttime search is required. In the former scenario, the magistrate unquestionably would reissue the warrant for the search because probable cause is still present, while in the latter scenario, there is no basis in which to conclude that the magistrate would issue, let alone reissue, the warrant to authorize a nighttime search that is not required.

opinion, has treated a nighttime search conducted under the aegis of a daytime warrant as a mere Rule 41 violation, rather than as an unconstitutional search. See United States v. Davis, 313 F. App'x 672, 674 (4th Cir. 2009). In concluding that the defendant's suppression motion was properly denied, the Davis court relied on precedent not involving an unauthorized nighttime search, but rather on precedent that states that a Rule 41 violation will result in suppression only if the party seeking suppression suffered prejudice or the government intentionally violated the rule. See id. (citing Hurwitz, 459 F.3d at 472 n.6). Some of our sister circuits have employed that same standard in refusing to suppress evidence obtained during unauthorized nighttime searches. See United States v. Schoenheit, 856 F.2d 74, 76-77 (8th Cir. 1988); Searp, 586 F.2d at 1124-25; United States v. Burke, 517 F.2d 377, 385-87 & n.14 (2d Cir. 1975). Those courts have considered factors such as: whether good cause could have been shown for a nighttime warrant had one been requested; whether the executing officers believed in good faith they had authority to conduct a nighttime search; whether the search was executed a short time before or after nighttime; and whether the search was in fact more abrasive because it was conducted in the nighttime. See Schoenheit, 856 F.2d at 76-77; Searp, 586 F.2d at 1124-25; Burke, 517 F.2d at 385-87 & n.14. For the reasons we espouse, we decline to follow

the Second, Sixth, and Eighth Circuits or our nonprecedential <u>Davis</u> decision. <u>See</u> <u>Collins v. Pond Creek Mining Co.</u>, 468 F.3d 213, 219 (4th Cir. 2006) ("[W]e ordinarily do not accord precedential value to our unpublished decisions."). Instead, we adhere to the well-reasoned decisions of the Third and Tenth Circuits, and the Supreme Court's decision in <u>Jones</u>.[21]

---

[21] In <u>United States v. Rizzi</u>, 434 F.3d 669 (4th Cir. 2006), we held that 21 U.S.C. § 879 ("A search warrant relating to offenses involving controlled substances may be served at any time of the day or night if the judge or United States magistrate issuing the warrant is satisfied that there is probable cause to believe that grounds exist for the warrant and for its service at such time.") and not Rule 41(e)(2)(A)(ii) (commanding executing officer to execute "the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time") governs a search warrant issued in a drug case. <u>Id.</u> at 671-75. We further held that § 879 authorizes a warrant in a drug case to be executed "day or night so long as the warrant itself is supported by probable cause." <u>Id.</u> at 674. Of note, in rejecting the defendant's constitutional challenge to § 879 based on the argument that § 879 could not provide a blanket authorization for a nighttime search, we noted that the "Supreme Court . . . has never held that the Fourth Amendment prohibits nighttime searches, despite the disapproval voiced occasionally by a Justice in dissent." <u>Id.</u> at 675. We further noted that "constitutionalizing a standard for when warrants can be served would involve so many variables that any rule would be difficult to articulate, much less serve as a component protection of the Fourth Amendment." <u>Id.</u> We do not read our <u>Rizzi</u> decision as foreclosing the result we reach here, namely, that a nighttime execution of a daytime warrant, absent justification, violates the Fourth Amendment. <u>Rizzi</u> involved a valid warrant that was validly executed at night. Our case involves a valid warrant that was invalidly executed at night. It is the invalid execution that rendered the search here unconstitutional under the Fourth Amendment, not the fact that a nighttime search took place. To be sure, for
(Continued)

Applying the foregoing principles to Yanez's Fourth Amendment timing claim reveals that the 5:00 a.m. search of the Premises violated the Fourth Amendment. Not only did the magistrate judge specify that the search warrant was to be executed in the daytime, he crossed out and explicitly rejected the alternative option that would have allowed the search to occur in the nighttime. Cf. Youngbey v. March, 676 F.3d 1114, 1125 (D.C. Cir. 2012) (determining that nighttime search was reasonable under warrant explicitly authorizing search in daytime or nighttime). There is no indication that the ICE agents sought or were granted verbal permission by the magistrate judge to execute the warrant during nighttime hours. Cf. United States v. Katoa, 379 F.3d 1203, 1207-08 (10th Cir. 2004) (finding nighttime search reasonable where judge who issued daytime warrant authorized nighttime search during subsequent phone call with officers). Nor is there an indication that any new facts were developed, after the warrant was issued, to support a nighttime search of the Premises. And, as noted earlier, there is no evidence concerning the presence

---

Fourth Amendment purposes, the nighttime search here rendered the search itself warrantless because the magistrate judge's reasonableness finding was premised on a daytime search; by contrast, the nighttime search in Rizzi did not involve a warrantless search.

- 77 -

of consent or exigent circumstances that would have justified the nighttime execution of the daytime warrant.

Rather, the facts are that the ICE agents secured a daytime warrant and decided to execute it during the nighttime, exceeding the authority granted by the magistrate judge. See United States v. Vigo, 413 F.2d 691, 693 (5th Cir. 1969) (reasoning that the "validity [of a daytime warrant] required it be served in the daytime"). Because the magistrate judge explicitly rejected a nighttime search, the warrant's daytime restriction must be construed against the agents. See United States v. Kelley, 652 F.3d 915, 917 (8th Cir. 2011) ("[W]hen police intend at the time they apply for a warrant to execute the search at night, it is unreasonable under the Fourth Amendment not to disclose that intent to the issuing magistrate and to seek express authorization for the night-time search.").

At bottom, Yanez's suppression motion implicates a simple rule: a daytime warrant does not authorize a nighttime search. The government implies that 5:00 a.m. essentially is "close enough" to 6:00 a.m. in the eyes of the Fourth Amendment. Notably, however, as John Adams observed in successfully defending British soldiers charged in the Boston Massacre, "[f]acts are stubborn things." David McCullough, John Adams 52 (2001). And the stubbornest fact here is that 5:00 a.m. is not

6:00 a.m.  At 6:00 a.m., the warrant sanctioned the ICE agents to enter into the Premises.  At 5:00 a.m., the warrant did not permit such an entry.  Because the nighttime execution of the daytime warrant violated Yanez's Fourth Amendment rights, as it was executed without consent or exigent circumstances, we must turn to the question of whether the agents egregiously violated Yanez's Fourth Amendment rights.

f

As noted above, the question of egregiousness turns on an evaluation of the totality of the circumstances.  There are two circumstances that support Yanez's egregiousness claim.  The first is that the Fourth Amendment violation occurred in her home, where her privacy interests are strong.  Jardines, 133 S. Ct. at 1414.  The second is that the entry occurred during the night, a time of day jealously protected by the Supreme Court.  Coolidge, 403 U.S. at 477.

On the other side of the ledger, several factors weigh in the government's favor.  There is no evidence that the ICE agents threatened, coerced, or physically abused Yanez, or promised her anything for her cooperation.  Unlike Umana and Mendoza, she was never handcuffed and was allowed to remain at the Premises following the search.  There is no evidence of diminished capacity on the part of Yanez, or that the questioning of her was particularly lengthy.  Also, there is

nothing in the record to suggest that the agents were motivated by racial considerations, and there is no evidence of improper intent on the part of the agents.[22]

While the totality scales at this point tilt in the government's favor, two additional facts seal Yanez's fate: (1) the ICE agents prepared a valid search warrant; and (2) the magistrate judge found the existence of probable cause to search the Premises in the daytime. As to the validity of the warrant, Agent Coker prepared a detailed and thorough affidavit laying out the facts in support of probable cause to believe that illegal aliens (and evidence of the harboring of illegal aliens) would be found in the Premises during a search. Yanez makes no challenge to the accuracy of the facts set forth in Agent Coker's affidavit, other than the description of the Premises as a single-story, single-family home. Under such circumstances, there simply is no doubt that the warrant was facially valid. Cf. Franks v. Delaware, 438 U.S. 154, 155-56 (1978) (holding "that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was

---

[22] Indeed, considering the circuit split on whether the nighttime execution of a daytime warrant, without consent or exigent circumstances, is a Fourth Amendment violation, it cannot credibly be argued that the ICE agents in this case intentionally violated the Fourth Amendment rights of Yanez by entering the Premises an hour before the warrant permitted.

included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request"). As to the presence of probable cause, the facts set forth in the affidavit undeniably support the magistrate judge's probable cause finding. See Illinois v. Gates, 462 U.S. 213, 238 (1983) (defining the test for probable cause as "whether, given all the circumstances . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place"). The agents conducted a painstaking surveillance operation that produced evidence of a fair probability that illegal aliens (and evidence of the harboring of illegal aliens) would be found during a search of the Premises. Like the facial validity of the warrant, Yanez makes no challenge to the magistrate judge's probable cause finding.

The presence of a valid search warrant supported by a magistrate judge's probable cause finding diminishes the degree of the intrusion on a resident's Fourth Amendment interests. Cf. Michigan v. Summers, 452 U.S. 692, 701 (1981) (noting that "[o]f prime importance in assessing the intrusion [on the defendant's privacy and liberty] is the fact that the police had obtained a warrant to search [defendant's] house for contraband"). This is so because the magistrate judge has

"authorized a substantial invasion of the privacy" of the persons residing in the place to be searched.  Id.

In Cotzojay, the alien's privacy interests continued to remain at their zenith--the search took place at night in the alien's home and the ICE agents did not attempt to procure a warrant.  Because the agents never attempted to procure a warrant, it is not surprising that the court there concluded that a nighttime warrantless search was egregious where the alien's privacy interests were so compelling and the conduct of the agents deplorable.  But cf. Martinez Carcamo, 713 F.3d at 923 (holding that Fourth Amendment violation was not egregious where ICE agents did not attempt to obtain a search warrant and entered the alien's home before approximately 6:00 a.m.).  However, in our case, Yanez's privacy interests were lower than those in Cotzojay and the conduct of the agents different.  The agents in our case had authorization to search, but not at night.  Thus, our case simply is not on the same plane as Cotzojay.

Put another way, if law enforcement officers do not attempt to secure a valid warrant supported by a magistrate judge's probable cause finding (as in Cotzojay), their conduct is more egregious than law enforcement officers who take the time to prepare a valid warrant and present it to a magistrate judge for a probable cause finding.  In the latter case, the law

enforcement officers' conduct is less offensive--they have sought and received authorization for a privacy interest invasion--while in the former case, the law enforcement officers' conduct borders on abhorrent, which renders the intrusion more severe and, hence, egregious.[23]

Sensing that she suffered a "mere garden-variety" violation of her Fourth Amendment rights, Garcia-Torres, 660 F.3d at 336, Yanez claims her case for egregiousness is buttressed by the excessive force used by the ICE agents in executing the warrant. Unfortunately for Yanez, the force used by the agents was reasonable.

The Supreme Court has repeatedly made clear that law enforcement officers, when executing a search, "may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." Los Angeles Cnty., Cal. v. Rettele, 550 U.S. 609, 614 (2007). It is for this reason that the Supreme Court has underscored that officers may detain the occupants of the premises while a search is

---

[23] Interestingly, had the ICE agents in Cotzojay obtained a daytime warrant and executed it at night, the Second Circuit would not have assessed the claim for Fourth Amendment egregiousness because such claims in the Second Circuit are analyzed under a Rule 41 harmless error analysis. See Burke, 517 F.2d at 385-87 & n.14 (applying harmless error analysis to Rule 41 nighttime execution violation). The upshot of this is that a nighttime execution of a daytime warrant is not a constitutional violation, let alone an egregious constitutional violation, in the Second Circuit.

conducted.  Summers, 452 U.S. at 705.  Such detentions, the Court has noted, are appropriate "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial."  Muehler v. Mena, 544 U.S. 93, 98 (2005).[24]  "Inherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention."  Id. 98–99.

Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard, judging the "reasonableness of a particular use of force . . . from the perspective of a reasonable officer on the scene."  Graham v. Connor, 490 U.S. 386, 395–96 (1989) (internal quotation marks omitted).  Generally, such claims require "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)) (internal quotation marks omitted).

The force here at issue consisted of the ICE agents

---

[24]  The reasonableness of the seizure in Summers was justified by three law enforcement objectives: (1) "preventing flight in the event that incriminating evidence is found"; (2) "minimizing the risk of harm to the officers"; and (3) facilitating "the orderly completion of the search" with the assistance of the detained occupants.  452 U.S. at 702–03.

breaking down Yanez's bedroom door, shouting "police" and "don't move," pointing a gun at her, and leading her downstairs at gunpoint to the living room couch. (J.A. 142). <u>Summers</u> stresses that the risk of harm to officers and occupants is minimized if the officers routinely exercise "unquestioned command of the situation." 452 U.S. at 703. Yanez was living in a home that the agents, based on extensive surveillance, suspected housed illegal aliens. For the safety of everyone involved, including Yanez, the agents were authorized to exercise unquestioned command of the situation by breaking the locked bedroom door down, shouting "police" and "don't move", and leading Yanez downstairs at gunpoint. (J.A. 142). Such actions in securing the home ensured there was no danger to the agents, the occupants, or the public. Once she arrived on the couch, Yanez was subjected to no further exercise of force during her detention, and, as noted, she was never handcuffed during the encounter. <u>Cf.</u> <u>Mena</u>, 544 U.S. at 98 (upholding the use of handcuffs during a two- or three-hour detention during execution of search warrant for weapons). Moreover, weapons were drawn no longer than necessary to secure the location in a potentially volatile situation. <u>Cf.</u> <u>Maryland v. Buie</u>, 494 U.S. 325, 335-36 (1990) (noting that a protective sweep may last "no longer than is necessary to dispel the reasonable suspicion of danger" and "no longer than it takes to complete the arrest and

depart the premises"). The force used here by the agents unquestionably was measured and by no means excessive (in the constitutional sense or otherwise). As such, the amount of such force does not help Yanez's egregiousness claim based on the timing of the search.[25]

Our discussion of the totality of the circumstances leads us to conclude that the Fourth Amendment violation here lacks the severity necessary to support a finding of egregiousness. Almeida-Amaral, 461 F.3d at 235. We hold that, although the nighttime execution of the daytime warrant violated

_____

[25] Because we hold that the force used by the ICE agents was measured and not excessive in the constitutional sense, we reject Yanez's stand-alone egregious Fourth Amendment violation claim based on the amount of force used by the agents. Moreover, to the extent that Yanez challenges the scope and duration of her seizure on Fourth Amendment egregiousness grounds, we reject this argument on the basis that her seizure was reasonable in its scope and duration. Under Summers, law enforcement officers are entitled to detain occupants of a premises for the whole length of most warranted searches. 452 U.S. at 705 n.21 (acknowledging possible exceptions to the Summers rule for "special circumstances" and "prolonged detention[s]," implying that the general rule of routine detention of residents of a house while it was being searched for contraband pursuant to a warrant confers the power to detain occupants for the length of such "routine" searches); see also Mena, 544 U.S. at 98 (holding that the resident's "detention for the duration of the search was reasonable under Summers because a warrant existed to search [the premises] and she was an occupant of that address at the time of the search"). In light of the two- or three-hour detention of an innocent bystander deemed "plainly permissible" by the Supreme Court in Mena, we cannot conclude that Yanez's seizure here became egregiously unconstitutional over time. 544 U.S. at 98.

Yanez's Fourth Amendment rights, such violation was not egregious under the totality of the circumstances.[26] Accordingly, both the IJ and the BIA correctly resolved this Fourth Amendment claim against Yanez.

3

Yanez also argues that her statements to the ICE agents were involuntary and, thus, were used against her in violation of her rights under the Due Process Clause of the Fifth Amendment. See Bustos-Torres v. INS, 898 F.2d 1053, 1057 (5th Cir. 1990) ("Because deportation hearings must conform to due process standards, however, an alien's involuntary statements cannot be used against him in a deportation hearing."); see also Anim v. Mukasey, 535 F.3d 243, 256 (4th Cir. 2008) ("The Federal Rules of Evidence do not apply in immigration proceedings, and evidentiary determinations are limited only by due process considerations."). To establish that her statements were involuntary, Yanez "must show coercion, duress, or improper action" by the agents that overbore her will. Puc-Ruiz, 629

---

[26] We note that, even under the Ninth Circuit's more alien-friendly qualified immunity egregiousness standard, Yanez would not prevail. As noted in Footnote 22, the law is unsettled on the question of whether the nighttime execution of a daytime warrant, without consent or exigent circumstances, is a Fourth Amendment violation. Given the state of the law, it cannot be said that the ICE agents in our case acted pursuant to the "unequivocal doctrinal backdrop" necessary for a finding of egregiousness under the Ninth Circuit's more lenient egregiousness standard. Martinez-Medina, 673 F.3d at 1035.

F.3d at 779.

The allegations presented to the IJ failed to establish a prima facie case of involuntariness. Yanez did not submit evidence of promises, prolonged questioning, interference with her right to counsel, or other indicia of coercion or duress that might suggest that her statements were involuntary, and she was never handcuffed during the entire episode. See Lopez-Gabriel, 653 F.3d at 687 ("Without more, prompt questioning of a handcuffed detainee by an armed and uniformed officer without Miranda warnings, and questioning by ICE agents after an arrest, are not sufficient to mandate a hearing or to justify suppression in an immigration proceeding."); id. (cases cited therein). Accordingly, like both the IJ and the BIA, we must reject Yanez's Fifth Amendment Due Process Clause claim.

In so rejecting, we note that Yanez's heavy reliance on the Second Circuit's decision in Singh v. Mukasey, 553 F.3d 207 (2d Cir. 2009), is misplaced. In Singh, the Second Circuit suppressed a signed statement made during an interrogation because the officers' conduct "undermined the reliability of the evidence in dispute." Id. at 215 (citation and internal quotation marks omitted). The court found that the alien was questioned for four hours in a border inspection station "where armed, uniformed officers were circulating," was repeatedly told he would be sent to jail, broke down and cried during the

interrogation that occurred in the middle of the night, was awake for twenty-four hours, and did not read the statement he signed that contained admissions he allegedly had made. Id. The court also noted that the interrogating officer persisted in asking the alien the same question until he got the answer he wanted. Id. at 216. Ultimately, the court found that the statements at issue were "nuanced and susceptible to corruption" and were therefore excludable. Id. According to the court, the statements were not related to "simple, specific, and objective facts," such as "whether a person is a foreign citizen or has a passport and valid visa." Id. Because the statements were unreliable, the court excluded them. Id. at 215.

Although the court in Singh discussed the egregious violation exception in Lopez-Mendoza, id. at 215-16, the court did not explicitly state whether the signed statement was suppressed because there was an egregious Fourth Amendment violation or because there was an egregious Fifth Amendment Due Process Clause violation. In excluding the statements, the court stated only that, "[e]ven assuming that the conduct here was not 'egregious,' it nonetheless undermined the reliability of the evidence in dispute." Id. at 215 (citation and internal quotation marks omitted). Thus, the court excluded the evidence on the basis that the unspecified constitutional violation undermined the probative value of the challenged evidence. Id.

The Second Circuit's decision in Singh hurts rather than helps Yanez's cause. As noted earlier, Yanez does not challenge the reliability of the evidence obtained as a result of the alleged wrongful interrogation, which was the basis on which the court in Singh suppressed the challenged statements. Moreover, the circumstances surrounding the questioning of the alien in Singh were decidedly more coercive than the questioning of Yanez in this case. Unlike Singh, Yanez was questioned at home for a brief period of time, and she was not repeatedly told she would be taken to jail. Moreover, unlike the nuanced statements in Singh, the questioning of Yanez was designed to obtain simple and objective factual statements, which it did. Finally, unlike the atmosphere in Singh, where the investigating officer repeatedly asked the same question until he got the answer he wanted, such was not the case here.

4

Finally, we turn to Yanez's argument that the ICE agents failed to follow five regulations, in particular, 8 C.F.R. § 287.8(a)(1)(iii) (regulating use of non-deadly force by agents), 8 C.F.R. § 287.3(c) (mandating advice concerning right to counsel), 8 C.F.R. § 287.8(b)(2) (regarding authority to briefly detain aliens for questioning), 8 C.F.R. § 287.8(c)(2)(i) (concerning power to arrest aliens), and 8 C.F.R. § 287.8(c)(2)(ii) (explaining requirement for obtaining

warrant prior to arresting alien).  We have recognized that "an agency's failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination."  United States v. Morgan, 193 F.3d 252, 266 (4th Cir. 1999).  However, an administrative determination will not be invalidated unless there is: (1) a violation (2) of a regulation intended for the alien's benefit (3) that causes prejudice to the alien.  Id.

We reject Yanez's reliance on the five regulations at issue.  First off, 8 C.F.R. § 287.12 prohibits any construction of Part 287 of the Code of Federal Regulations "to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal."  8 C.F.R. § 287.12.  As such, Yanez arguably suffered no prejudice.  Cf. Navarro-Chalan, 359 F.3d at 23 ("Finally, even if § 287.3 were applicable and were violated, INS regulations state that § 287.3 and the other regulations in its subpart "do not, are not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal." (citation and internal quotation marks omitted)).  In any event, even assuming a violation of the regulations in Part 287 creates an avenue for suppression, Yanez's regulatory claims are without merit, either

because the regulation is inapplicable, see Oliva-Ramos, 694 F.3d at 286 (stating that formal proceedings do not begin until a Notice to Appear is filed in immigration court, at which point 8 C.F.R. § 287.3(c) is triggered), or redundant to our prior analyses, see 8 C.F.R. § 287.8(a)(1) (prohibiting excessive force, which did not exist here), id. § 287.8(b)(2) (permitting a brief detention for questioning if there is reasonable suspicion that a person is an illegal alien--such suspicion obviously was present and, in any event, Yanez's detention was permitted while the diligent search took place), id. § 287.8(c) (circumscribing "arrests" to certain contexts--Yanez was not arrested, but rather permissibly detained while the diligent search was conducted).

III

For the reasons stated herein, we deny Yanez's petition for review.

<u>PETITION DENIED</u>